**C.L. WESTBROOK, JR., Petitioner,**

v.

**Peggy Lee PENLEY, Respondent.**

No. 04–0838.

Supreme Court of Texas.

Argued Sept. 26, 2006.

Decided June 29, 2007.

Rehearing Denied Sept. 28, 2007.

J. Wade Birdwell, James G. Stouffer Jr., Wallach, Andrews & Stouffer, P.C., Fort Worth, Kelly J. Shackelford, Hiram S. Sasser III, Jonathan M. Saenz, Plano, for Petitioner.

Darrell L. Keith, Courtney Shannon Keith, Keith Law Firm, P.C., Jeffrey H. Kobs, Kobs & Haney, P.C., Fort Worth, Kirk L. Pittard, Leighton Durham III, Durham & Pittard, L.L.P., Dallas, for Respondent.

James Roddy Tanner, J. Shelby Sharpe, Sharpe & Tillman, P.C., Fort Worth, for Other.

Jerry D. Bullard, Adams, Lynch & Loftin, P.C., Bedford, TX, Carl H. Esbeck, Columbia, MO, for Amicus Curiae.

Justice O'NEILL delivered the opinion of the Court.

In this case, we must decide the constitutionally appropriate role of civil courts in resolving tort actions that arise from acts of church discipline. The defendant pastor in this case, C.L. "Buddy" Westbrook, Jr., who is also a licensed professional counselor, directed his congregation to shun Peggy Lee Penley, a former parishioner, for engaging in a "biblically inappropriate" relationship, which the ecclesiastical disciplinary process outlined in the church's constitution required him to do. Claiming Westbrook had learned the disclosed information in a secular counseling session, Penley filed this suit against him for professional negligence.

For purposes of our review, we presume the counseling at issue was purely secular in nature as Penley claims. Even so, we cannot ignore Westbrook's role as Penley's pastor. In his dual capacity, Westbrook owed Penley conflicting duties; as Penley's counselor he owed her a duty of confidentiality, and as her pastor he owed Penley and the church an obligation to disclose

her conduct. We conclude that parsing those roles for purposes of determining civil liability in this case, where health or safety are not at issue, would unconstitutionally entangle the court in matters of church governance and impinge on the core religious function of church discipline. Accordingly, we reverse the court of appeals' judgment and dismiss the case for want of jurisdiction.

## I. Background

Penley experienced marital difficulties with her husband, Benjamin Stone, and in August 1998 obtained counseling services from Westbrook, a licensed professional marriage counselor and her fellow parishioner at McKinney Memorial Bible Church. This counseling took place in three sessions at Westbrook's office and Penley paid for two or three of these sessions. Westbrook also conducted two counseling sessions with Stone in August 1998.

In October 1999, Westbrook and others, including Penley and Stone, broke from their church and formed CrossLand Community Bible Church ("CrossLand"). Westbrook was elected CrossLand's pastor and also served as a church elder. Cross-Land, a "Christ-centered church," operated according to biblical principles and practices described in the church's constitution and statement of faith. CrossLand requires all membership applicants to affirm their willingness to abide by the church's constitution, which contains the following disciplinary policy:

We believe that one of the primary responsibilities of the church is to main-

tain the purity of the Body. We are directed by God to be holy. In recognition of the importance of this obligation, the elders will biblically and lovingly utilize every appropriate means to restore members who find themselves in patterns of serious misconduct. When efforts at restoration fail, the elders will apply the Biblical teaching on church discipline, which could include revocation of membership, along with an appropriate announcement made to the membership (Matt 18:15–17; I Cor 5:1–5; Gal 6:1, 2; 2 Thes 3:6).

The church's constitution provides that, if a member engages in conduct that "violates Biblical standards, or which is detrimental to the ministry, unity, peace or purity of the church," and the member is unrepentant, "the elders will follow our Lord's instructions from *Matthew* 18:15–20." [1] If the member remains unrepentant and chooses not to resign, the constitution instructs the church authority to revoke the parishioner's membership and announce the member's removal to the congregation. The church's stated goal is "to encourage repentance and restoration of fellowship with the Lord and His people."

Penley became a CrossLand member the same month the church was formed in October 1999. In applying for membership, Penley answered various inquiries contained in a document titled "CrossLand Community Bible Church Questions for Membership." Her answers confirmed Penley's agreement with a statement of the church's beliefs. In response to a request to "[a]ffirm your willingness to

---

1. *Matthew* 18 states:
 If your brother sins, go and show him his fault in private; if he listens to you, you have won your brother. But if he does not listen to you, take one or two more with you, so that by the mouth of two or three witnesses every fact may be confirmed. If he refuses to listen to them, tell it to the church; and if he refuses to listen even to the church, let him be to you as a Gentile and a tax collector.
 THE HOLY BIBLE, *Matthew* 18:15–17 (New American Standard Bible).

abide by the constitution of this church," Penley responded, "[s]ure, I can abide by the church constitution . . . willingly."

In July 2000, Penley separated from her husband. Thereafter, Penley and Stone participated in a series of weekly counseling sessions at Westbrook's home where couples from the church discussed how to improve their marriages. According to Penley, the Bible was not discussed in these sessions and she considered them to be an extension of her prior professional counseling relationship with Westbrook. Westbrook did not charge for these sessions, and all of the couples who participated were CrossLand members.

The marital counseling sessions proved to be unsuccessful, and Penley decided that she would seek a divorce from Stone. Around October 2000, Penley and Stone went to Westbrook's home for what they thought would be another group session, but Westbrook and his wife were the only ones there. During a break, Penley spoke separately with Westbrook and informed him that she had decided to divorce Stone. She also confided that she had engaged in an extramarital sexual relationship. According to Penley's pleadings, Westbrook counseled her and recommended a family law attorney she could consult. When Westbrook broached the topic of church discipline that her extramarital relationship would require, Penley informed him that she was resigning from CrossLand.

Thereafter, Westbrook and the church elders composed a letter to the CrossLand congregation concerning Penley's actions, which they published to the membership on November 7, 2000. The letter described the three-step disciplinary process by which CrossLand members were bound as follows:

The process first involves one individual going to the brother or sister in sin. If the one caught in sin "listens," meaning listens to the Lord and repents (changes direction), then the process is complete—"you have won your brother or sister."

However, if the one in sin chooses not to "listen," and continues in this pattern, the instructions are clear. A small group of two or three or more are to go back with you to the one in sin. We believe this group should be comprised of individuals who are mature and godly believers and who know and love the one in sin. If the one in sin "listens," then the process is complete—again, "you have won your brother or sister."

If the one in sin "refuses to listen" to this group of two or three, then the instructions are to "tell it to the church." If the one in sin now "listens," the process is complete—and we have "won our brother or sister."

Notice, however, "if he refuses to listen even to the church, let him be to you as a Gentile and a tax-gatherer.'" As somewhat of an oversimplification, this means to treat the one in sin as an outsider. Through their continuing sin, they forfeit their membership in the church, and the members of the church are to break fellowship with them.

The letter explained to the congregation that Penley intended to divorce her husband, there was no biblical basis for the divorce, she had engaged in a "biblically inappropriate" relationship with another man, and she had rejected efforts to bring her to repentance and reconciliation. Describing the disciplinary process as one of "tough love," the letter encouraged the congregation to "break fellowship" with Penley in order to obtain her repentance and restoration to the church body. The letter admonished the congregation to treat the matter as a "members-only issue, not to be shared with those outside [the congregation]."

In November 2001, Penley sued Westbrook, CrossLand and the church elders alleging causes of action for defamation, negligence, breach of fiduciary duty, and intentional infliction of emotional distress. In response to her claims, Westbrook filed a plea challenging the court's jurisdiction, contending the suit involved an "ecclesiastical dispute" concerning a church disciplinary matter, which the First and Fourteenth Amendments to the United States Constitution precluded the trial court from adjudicating. The church and the elders filed a similar motion to dismiss. The trial court granted the defendants' motions and dismissed the case. Penley appealed the trial court's order, but subsequently dismissed her appeal as to all defendants except Westbrook. The court of appeals affirmed the trial court's dismissal of all claims against Westbrook except for professional negligence, which it held concerned Westbrook's role as Penley's secular professional counselor and did not invoke First Amendment concerns. 146 S.W.3d 220, 233. We granted Westbrook's petition for review to examine the trial court's jurisdiction over Penley's professional-negligence claim in light of the First Amendment's religion clauses.[2]

## II. Review Standard

A plea questioning the trial court's subject-matter jurisdiction raises a question of law that we review *de novo.* *See Tex. Dep't of Parks and Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004). Lack of jurisdiction may be raised by a plea to the jurisdiction when religious-liberty grounds form the basis for the jurisdictional challenge.[3] *See Tilton,* 925 S.W.2d at 682; *Green v. United Pentecostal Church Int'l,* 899 S.W.2d 28, 30 (Tex. App.-Austin 1995, writ denied). We focus first on the plaintiff's petition to determine whether the facts pled affirmatively demonstrate that subject-matter jurisdiction

---

**2.** The National Association of Evangelicals, the Southwestern Baptist Theological Seminary, and Dallas· Theological Seminary submitted *amicus curiae* briefs in support of Westbrook's petition.

**3.** Most courts agree that the general prohibition on the adjudication of religious questions, once triggered, precludes further adjudication of the issue in question. Scott C. Idleman, *Tort Liability, Religious Entities, and the Decline of Constitutional Protection,* 75 IND. L.J. 219, 225 (2000). However, there is some disagreement as to the prohibition's precise legal operation. *Id.* A few courts conceptualize the general prohibition as a question of justiciability. *See, e.g., Najafi v. INS,* 104 F.3d 943, 949 (7th Cir.1997) (stating "true belief is not readily justiciable"); *Nayak v. MCA, Inc.,* 911 F.2d 1082, 1083 (5th Cir. 1990) (stating "the 'correct' interpretation of the life of Christ . . . is not a justiciable question before a federal court"). Some treat the matter as an affirmative defense to liability. *See In re: Roman Catholic Archbishop of Portland in Or.,* 335 B.R. 842, 849, 853 (Bankr.Or.2005) (granting summary judgment on affirmative defense of lack of subject-matter jurisdiction); *Brazauskas v. Fort Wayne–South Bend Diocese, Inc.,* 796 N.E.2d 286, 290 (Ind.2003) (stating "pleading an affirmative defense ʼlike the Free Exercise Clause may under certain facts entitle a party to summary judgment"). But the majority of courts broadly conceptualize the prohibition as a subject-matter bar to jurisdiction. *See, e.g., Tilton v. Marshall,* 925 S.W.2d 672, 682 (Tex.1996) (holding trial court abused its discretion in refusing to dismiss plaintiffs' intentional infliction of emotional distress and related conspiracy claims and prohibiting court from exercising jurisdiction over them except to dismiss); *Bell v. Presbyterian Church,* 126 F.3d 328, 330–33 (4th Cir.1997) (affirming dismissal for lack of subject-matter jurisdiction under First Amendment); *Klagsbrun v. Va'ad Harabonim of Greater Monsey,* 53 F.Supp.2d 732, 736 (dismissing for lack of subject-matter jurisdiction under Establishment Clause); *Young v. N. Ill. Conference of United Methodist Church,* 21 F.3d 184, 185–88 (7th Cir.1994) (holding First Amendment precluded subject-matter jurisdiction over Title VII suit challenging church hiring procedures).

exists. *Miranda,* 133 S.W.3d at 226. If the pleadings are insufficient to establish jurisdiction but do not affirmatively demonstrate an incurable defect, the plaintiff should be afforded the opportunity to replead. *Id.* at 226–27. A plea should not be granted if a fact issue is presented as to the court's jurisdiction, but if the pleadings affirmatively demonstrate an incurable jurisdictional defect, then the plea to the jurisdiction must be granted. *Id.* at 227–28.

### III. Discussion

### A. The First Amendment Religion Clauses

 The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. Amend. I. This seemingly straightforward pronouncement has generated volumes of interpretational jurisprudence. At its core, the First Amendment recognizes two spheres of sovereignty when deciding matters of government and religion. The religion clauses are designed to "prevent, as far as possible, the intrusion of either [religion or government] into the precincts of the other," *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and are premised on the notion that " 'both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere.' " *Aguilar v. Felton,* 473 U.S. 402, 410, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985) (quoting *McCollum v. Bd. of Ed.,* 333 U.S. 203, 212, 68 S.Ct. 461, 92 L.Ed. 649 (1948)). The First Amendment's limitations on government extend to its judicial as well as its legislative branch. *See Kreshik v. Saint Nicholas Cathedral,* 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960).

 Government action may burden the free exercise of religion in two quite different ways: by interfering with an individual's observance or practice of a particular faith, *see, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), and by encroaching on the church's ability to manage its internal affairs, *see, e.g., Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952). *See EEOC v. Catholic Univ. of Am.,* 83 F.3d 455, 460 (D.C.Cir.1996). Westbrook and Penley appear to agree that the church-autonomy cases govern the analysis in this case, but they disagree over their effect.

### B. The Parties' Contentions

Westbrook contends Penley's suit encroaches upon the autonomy of churches to decide matters of internal church discipline and governance. He acknowledges that there are exceptions to the concept of church autonomy, but claims they should be narrowly drawn by allowing judicial interference in church disciplinary matters only when a claim arises from a purely secular act. Westbrook describes actions that are purely secular in nature as those that are clearly nonreligious in motivation, like intentional torts or sexual misconduct. According to Westbrook, if there is any doubt as to the secular or religious nature of a particular action, courts should proceed no further. Any less deferential standard, Westbrook claims, would require a case-by-case analysis that would in itself excessively entangle the courts with religion and infringe upon the church's authority. In this case, Westbrook asserts, once Penley admitted that she looked to him as both a counselor and a pastor, the

trial court was precluded from adjudicating her claim. The rationale, Westbrook explains, is to avoid courts having to determine which acts are done in a secular role and which are done in an ecclesiastical capacity, particularly when there is such a blend of roles, as here, that makes it impossible to perceive where one ends and the other begins.

Penley, on the other hand, argues that the doctrine of church autonomy protects religious relationships by preventing judicial resolution of ecclesiastical disputes that turn on matters of religious doctrine or practice. This protection, she argues, does not shield a licensed professional counselor from liability that arises from a secular counseling relationship simply because scripture might occasionally be discussed. According to Penley, the First Amendment does not preclude judicial review of claims that do not derive from or depend upon religious doctrine. Penley contends that categorically excluding religious relationships from judicial scrutiny would necessarily extend constitutional protection to the secular components of such relationships and place religious leaders in preferred positions in our society.

## C. Civil Courts and Church Autonomy

We agree that the First Amendment does not necessarily bar all claims that may touch upon religious conduct. *See Tilton*, 925 S.W.2d at 677. But in order to gauge the constitutional validity of a particular civil action, we must first identify the nature of the constitutional interest at stake. When a pastor who holds a professional counseling license engages in marital counseling with a parishioner, the line between the secular and the religious may be difficult to draw.[4] In that instance, secular rules that govern the professional relationship may conflict with or impinge upon religious tenets or standards of conduct to which the church and its members have voluntarily bound themselves. Deciding which should yield requires a careful analysis of the respective interests sought to be protected.

The interest that Penley asserts concerns the confidentiality that protects communications between a licensed professional counselor and a client. *See* 22 Tex. Admin. Code § 681.41(x). It is Westbrook's breach of this secular duty to maintain confidentiality that Penley contends caused her injury. Unlike resolving Penley's originally asserted but later abandoned defamation claim, which would have required the court to delve into the religious question of whether Westbrook's statement about the biblical impropriety of Penley's behavior was true or false, deciding whether Westbrook breached a secular duty of confidentiality as a licensed professional counselor would not, according to Penley, require resolution of a theological matter. Because her claim does not re-

---

4. *See Destefano v. Grabrian*, 763 P.2d 275, 285 n. 10 (Colo.1988) (" 'Family counseling and psychological counseling are two notable areas in which there is substantial overlap between the secular and religious aspects of a spiritual counselor's activities.' ") (quoting Note, *Clergy Malpractice: Taking Spiritual Counseling Conflicts Beyond Intentional Tort Analysis*, 19 Rutgers L.J. 419, 437 (1988)), and citing Comment, *Made Out of Whole Cloth? A Constitutional Analysis of the Clergy Malpractice Concept*, 19 Cal. W.L.Rev. 507, 516 (1983) (noting that pastoral counseling is a religious, not secular, activity in which "[i]t is impossible to separate the 'cure of the minds' from the 'cure of the souls' ") (quoting S. Ericsson, *Clergyman Malpractice: Ramifications of a New Theory*, 16 Val. U.L.Rev. 163, 166 (1981)); Comment, *Clergy Malpractice: Making Clergy Accountable to a Lower Power*, 14 Pepperdine L.Rev. 137, 139 (1986) ("While some degree of overlap and similarity may exist, the religious counselor remains distinct and unique from his secular counterpart, approaching therapy from an entirely different perspective.").

quire the court to resolve a religious question, Penley maintains her professional negligence action does not run afoul of the First Amendment.

 But Penley's argument goes to only one area of constitutional concern and ignores another. While it might be theoretically true that a court could decide whether Westbrook breached a secular duty of confidentiality without having to resolve a theological question, that doesn't answer whether its doing so would unconstitutionally impede the church's authority to manage its own affairs. Churches have a fundamental right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff,* 344 U.S. at 116, 73 S.Ct. 143; *see Catholic Univ. of Am.,* 83 F.3d at 462. It is a core tenet of First Amendment jurisprudence that, in resolving civil claims, courts must be careful not to intrude upon internal matters of church governance:

> The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine and to create tribunals for the decision of controverted questions of faith within the association, and for the

ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

*Watson v. Jones,* 80 U.S. (13 Wall.) 679, 728–29, 20 L.Ed. 666 (1872).[5] Accordingly, the autonomy of a church in managing its affairs and deciding matters of "church discipline ... or the conformity of the members of the church to the standard of morals required of them" has long been afforded broad constitutional protection. *Id.* at 733.[6]

 This Court, too, has long recognized a structural restraint on the constitu-

---

**5.** Although *Watson* was decided before application of the Fourteenth Amendment to state action and thus turned on general federal law, it nevertheless delineated the limited role civil courts may constitutionally play in resolving controversies that touch upon religion. *See Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 710, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

**6.** Courts have grounded the doctrine of church autonomy in different aspects of the First Amendment, some looking to the Free Exercise Clause, some to the Establishment Clause, some to both, and others to neither in particular. *See* Idleman, 75 IND. L.J. at 223–25; *see also Bollard v. Cal. Province of the Soc'y of Jesus,* 211 F.3d 1331, 1332 (9th Cir. 2000), *denying reh'g en banc* (Wardlaw, J.,

dissenting) ("Though the concept originated through application of the Free Exercise Clause, the Supreme Court has held that the Establishment Clause also protects church autonomy in internal religious matters."); *see generally* Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy,* 81 COLUM. L.REV. 1373 (1981) (positing that Free Exercise Clause protections against burdens or restrictions on religion more appropriately address church autonomy concerns than the Establishment Clause, which prohibits government sponsorship of religion). Because this case does not raise the question of government-sponsored religion, we ground our analysis in the Free Exercise Clause.

tional power of civil courts to regulate matters of religion in general, *Brown v. Clark*, 102 Tex. 323, 116 S.W. 360, 363 (Tex.1909), and of church discipline in particular, *Minton v. Leavell*, 297 S.W. 615, 621–22 (Tex.Civ.App.-Galveston 1927, writ ref'd). The *Minton* court cogently explained why courts must decline jurisdiction over disputes concerning church membership:

> It seems to be settled law in this land of religious liberty that the civil courts have no power or jurisdiction to determine the regularity or validity of the judgment of a church tribunal expelling a member from further communion and fellowship in the church. Membership in a church creates a different relationship from that which exists in other voluntary societies formed for business, social, literary, or charitable purposes.
>
> Church relationship stands upon a different and higher plane, and the right of a church to decide for itself whom it may admit into fellowship or who shall be expelled or excluded from its fold cannot be questioned by the courts, when no civil or property rights are involved.
>
> ... If the courts assume jurisdiction to question the validity of a judgment of a church court upon a question of this character, the churches would be deprived of the right of construing and administering their church laws....

*Minton*, 297 S.W. at 621–22; *see also Brown*, 116 S.W. at 363 ("[W]henever the questions of discipline or of faith or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept as final, and as binding on them in their application to the case before them.") (quoting *Watson*, 80 U.S. (13 Wall.) at 727).

More recently, in *Williams v. Gleason*, the court of appeals declined jurisdiction over parishioners' tort claims against church members who participated in the church disciplinary process, finding that "each claim implicates an ecclesiastical matter, namely their subjection to the church's discipline." 26 S.W.3d 54, 59 (Tex. App.-Houston [14th Dist.] 2000, pet. denied), *cert. denied*, 533 U.S. 902, 121 S.Ct. 2242, 150 L.Ed.2d 231 (2001). Disgruntled parishioners cannot circumvent ecclesiastical immunity by suing church members rather than the religious body itself, the court stated, else such immunity "would be an empty protection" and "there would be an inappropriate chilling effect on the ability of churches to discipline their members." *Id.; see also Libhart v. Copeland*, 949 S.W.2d 783, 793 (Tex.App.-Waco 1997, no pet.); *Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex.App.-Houston [1st Dist.] 1996, no pet.).

### D. The Neutral–Principles Exception

The Supreme Court has recognized an exception to the doctrine of church autonomy when neutral principles of law may be applied to resolve disputes over ownership of church property. These exceptions, though, have been narrowly drawn for reasons aptly expressed by the Supreme Court in *Watson* over a century ago, and more recently in *Milivojevich*, 426 U.S. at 709, 96 S.Ct. 2372, and *Jones v. Wolf*, 443 U.S. 595, 603–05, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). If civil courts undertake to resolve essentially religious controversies, " 'the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern....' " *Milivojevich*, 426 U.S. at 710, 96 S.Ct. 2372 (quoting *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian*

*Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969)).

■ *Milivojevich* involved an intra-church dispute over control of the property and assets of the Serbian Eastern Ortho-dox Diocese for the United States and Canada. *Milivojevich,* 426 U.S. at 698–99, 96 S.Ct. 2372. The Supreme Court reject-ed the Illinois Supreme Court's purported reliance on neutral principles of law in its holding that the Diocesan reorganization and Milivojevich's removal as Bishop were invalid, and outlined the broad autonomy our Constitution affords churches in decid-ing matters that touch upon religious doc-trine. *See id.* at 720–26, 96 S.Ct. 2372. Emphasizing that the First Amendment severely limits the role of civil courts in resolving "religious controversies that inci-dentally affect civil rights," *id.* at 711, 96 S.Ct. 2372, the Court mandated judicial deference to the church if ownership de-terminations involve underlying questions of religious doctrine. *Id.* at 709–10, 96 S.Ct. 2372 (citing *Presbyterian Church,* 393 U.S. at 449, 89 S.Ct. 601). Important-ly, the Court noted that the principle of judicial deference is not limited to disputes over church property, but "applies with equal force to church disputes over church polity and church administration." *Id.* at 710, 96 S.Ct. 2372.

■ The Supreme Court again ad-dressed an intra-church dispute over prop-erty ownership in *Jones,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775. The Court held that states may adopt neutral princi-ples of law as a means of adjudicating such disputes without running afoul of First Amendment concerns, so long as resolu-tion of ownership entails no inquiry into religious doctrine. *Jones,* 443 U.S. at 602–05, 99 S.Ct. 3020. Called upon to decide which faction of the formerly united church congregation was entitled to pos-session of a specific parcel of land, the Court stated that civil courts have general authority to resolve such questions given the "obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be de-termined conclusively." *Id.* at 602, 99 S.Ct. 3020. Even so, the Court empha-sized that the First Amendment severely circumscribes the role civil courts may play in resolving such disputes; if inter-pretation of the instruments of ownership would require the court's resolution of a religious controversy, the court must defer to ecclesiastical resolution of the doctrinal issue. *Id.* at 604, 99 S.Ct. 3020.

Penley urges us to apply the neutral-principles approach to her professional-negligence claim, contending her claim can be resolved under neutral tort principles without resorting to or infringing upon religious doctrine. But even if we were to expand the neutral-principles approach be-yond the property-ownership context as Penley requests, we disagree that free-exercise concerns would not be implicated. A church's decision to discipline members for conduct considered outside of the church's moral code is an inherently reli-gious function with which civil courts should not generally interfere. *See Wat-son,* 80 U.S. (13 Wall.) at 727. Courts have no jurisdiction to "revise or question ordinary acts of church discipline" and "cannot decide who ought to be members of the church, nor whether the excommuni-cated have been justly or unjustly, regular-ly or irregularly cut off from the body of the church." *Id.* at 730 (quoting *Shannon v. Frost,* 42 Ky. (3 B. Mon.) 253, 258 (1842)). This is because "the judicial eye cannot penetrate the veil of the church for the forbidden purpose of vindicating the alleged wrongs of excised members; when they became members they did so upon the condition of continuing or not as they

and their churches might determine, and they thereby submit to the ecclesiastical power and cannot now invoke the supervisory power of the civil tribunals." *Id.* at 731 (citing *Ferraria v. Vasconcelles,* 23 Ill. 456, 461 (1860) (quoting *Frost,* 42 Ky. (3 B. Mon.) at 259)).

Penley contends the primary focus of her complaint is not the letter disseminated to the congregation or CrossLand's disciplinary process, even though the damages she seeks clearly appear to have arisen from those events. Rather, Penley explains, her suit centers on Westbrook's initial disclosure to the church elders of confidential information obtained during the marital counseling sessions, which she claims constituted a breach of professional counseling standards. Because "her primary focus is on Westbrook's disclosure of her confidential information to others separate and apart from the publication of the November 7 letter," Penley contends her claims "do not involve matters of religious doctrine, practice, or church governance."

It is true that Penley pins Westbrook's liability in this case, at least in part, on his breach of a secular duty by disclosing Penley's confidential information to the church elders in the first instance. However, this disclosure cannot be isolated from the church-disciplinary process in which it occurred, nor can Westbrook's free-exercise challenge be answered without examining what effect the imposition of damages would have on the inherently religious function of church discipline. Subjecting CrossLand's pastor to tort liability for engaging in the disciplinary process that the church requires would clearly have a "chilling effect" on churches' ability to discipline members, *Williams,* 26 S.W.3d at 59, and deprive churches of their right to construe and administer church laws, *Minton,* 297 S.W. at 622. *See Paul*

*v. Watchtower Bible & Tract Soc'y of N. Y., Inc.,* 819 F.2d 875, 881 (9th Cir.1987) (noting that imposing tort liability for shunning on a church would "in the long run have the same effect as prohibiting the practice and would compel the Church to abandon part of its religious teachings"). In sum, while the elements of Penley's professional-negligence claim can be *defined* by neutral principles without regard to religion, the *application* of those principles to impose civil tort liability on Westbrook would impinge upon CrossLand's ability to manage its internal affairs and hinder adherence to the church disciplinary process that its constitution requires. *See* Idleman, 75 IND. L.J. at 254 n. 96.

### E. Discrimination and the Ministerial Exception

Cases involving claims of employment discrimination in church-minister relations are closely analogous, where the government's interest in eradicating discrimination collides with the church's constitutional right to manage its internal affairs free from government interference. *See, e.g., EEOC v. Catholic Univ. of Am.,* 83 F.3d at 460. In these circumstances, courts have generally held that jurisdiction over a minister's Title VII claims of sex- and race-based discrimination must yield to First Amendment concerns when necessary to preserve the church's autonomy to manage its internal affairs.

In *Catholic University of America,* for example, Sister Elizabeth McConough, a nun in the Dominican Order, alleged that the university had engaged in sex discrimination and retaliatory conduct in violation of Title VII of the Civil Rights Act of 1964 when it denied her tenure in its Department of Canon Law. *Catholic Univ. of Am.,* 83 F.3d at 457. The Equal Employment Opportunity Commission argued, as Penley does here, that the dispute could be

resolved by applying neutral principles of law without entangling the government in questions of religious doctrine. *Id.* at 465–66. The court disagreed, distinguishing the neutral trust- and property-law principles that were employed in *Jones* to determine ownership of land. *Id.* at 466. Acknowledging that generally an assessment of scholarship involves objective criteria independent of religious content, the court determined that those evaluating McDonough's publications were ultimately being asked to decide whether she was qualified to "teach in the name of the Church." *Id.* Consequently, there was an inevitable risk that those who assessed her scholarship would have to consider whether her conclusions were in accord with what they believed the Church ought to teach. *Id.* As the trial court noted after attempting to decide the case applying neutral principles, " 'no expert testimony could effectively filter out the religious elements from the secular ones sufficiently to avoid unwholesome and impermissible entanglement with religious concerns.' " *Id.* (quoting *EEOC v. Catholic Univ. of Am.*, 856 F.Supp. 1, 12 (D.D.C.1994)). Because re-solving McDonough's Title VII claims could interfere with the church's ability to resolve matters of religion, the court held it lacked jurisdiction. *Id.* at 467.[7]

In *Combs v. Central Texas Annual Conference of the United Methodist Church,* Reverend Combs appealed the dismissal of her Title VII sex- and pregnancy-discrimination suit against the church. 173 F.3d 343 (5th Cir.1999). The sole issue before the Fifth Circuit was whether the district court correctly determined that the First Amendment precluded it from considering Combs's employment-discrimination case, even when the church's challenged actions were not based on religious doctrine. *Id.* at 345. Combs argued that the court had subject-matter jurisdiction because, unlike in *Catholic University* where the liability determination would have required an evaluation of church doctrine, there would be no such need in her case. *Id.* at 350. The court rejected this argument, reiterating the First Amendment's two-fold concern; that secular courts should not interpret religious doctrine, nor should they intrude into church governance in a man-

---

7. *See also Drevlow v. Lutheran Church, Mo. Synod,* 991 F.2d 468, 470–71 (8th Cir.1993) (holding minister's claim that the Synod violated its bylaws by removing his name from list of eligible ministers not justiciable by secular courts); *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1356–58 (D.C.Cir.1990) (holding the application of age-discrimination law in the minister's lawsuit against his church violative of the Free Exercise Clause); *Simpson v. Wells Lamont Corp.,* 494 F.2d 490, 493–95 (5th Cir.1974) (holding application of Civil Rights Act to pastor's claim of racial discrimination would encroach upon the church's right to be free from secular interference and to decide for themselves matters of church government); *McClure v. Salvation Army,* 460 F.2d 553, 560–61 (5th Cir.1972) (holding application of Title VII to the employment relationship between the Salvation Army and its ordained minister would involve a review that would cause improper state intrusion on mat-ters of church governance); *cf. Scotts African Union Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church,* 98 F.3d 78, 94–96 (3rd Cir.1996) (applying neutral-principles approach because aspects of the ownership determination that might touch on the church-governance sphere were irrelevant to the ultimate ownership question); *Church of God in Christ, Inc. v. Graham,* 54 F.3d 522, 525–26 (8th Cir.1995) (applying neutral legal principles to the property dispute because ecclesiastical affairs were not implicated); *Sanders v. Casa View Baptist Church,* 134 F.3d 331, 336 (5th Cir.1998), (acknowledging that protecting relationships not purely secular in nature might foster development of important spiritual ties, but holding "the constitutional guarantee of *religious* freedom cannot be construed to protect *secular* beliefs and behavior, even when they comprise part of an otherwise religious relationship between a minister and a member of his or her congregation").

ner that would be inherently coercive, even when the alleged discrimination is purely nondoctrinal. *Id.* Penley's contention implicates the latter concern, which the court in *Combs* found was enough to bar jurisdiction because the congressional mandate to eliminate discrimination in the work place must give way to the constitutional mandate to preserve church autonomy. *Id.*

### F. Penley's Professional–Negligence Claim

We conclude that the secular confidentiality interest Penley's professional-negligence claim advances fails to override the strong constitutional presumption that favors preserving the church's interest in managing its affairs. Penley voluntarily became a member of the church body and agreed to abide by the church constitution; indeed, she expressed that she did so "willingly." That constitution outlined the disciplinary process that would be followed if a member engaged in conduct that the church considered inappropriate. As CrossLand's and Penley's pastor, Westbrook assumed an obligation to Penley and to the congregation to follow the church's constitution. Although Penley contends pastoral counseling is not at issue because she did not receive marital counseling from Westbrook in his capacity as a member of the clergy, the publication about which Penley complains was made in the course of the church disciplinary process and communicated by Westbrook pursuant to the requirements of that process. And even though Penley's suit is now against Westbrook and no longer the church, it is well-settled that "[t]he interaction between the church and its pastor is an integral part of church government," *Simpson,* 494 F.2d at 493, and "[t]he relationship between an organized church and its ministers is its lifeblood." *McClure,* 460 F.2d at 558.

Even if Westbrook's dual roles as Penley's secular counselor and her pastor could be distinguished, which is doubtful, Westbrook could not adhere to the standards of one without violating the requirements of the other. Any civil liability that might attach for Westbrook's violation of a secular duty of confidentiality in this context would in effect impose a fine for his decision to follow the religious disciplinary procedures that his role as pastor required and have a concomitant chilling effect on churches' autonomy to manage their own affairs. *See, e.g., Watchtower Bible & Tract Soc'y.,* 819 F.2d at 881 (stating "the burden of tort damages is direct ... [w]ere we to permit recovery, 'the pressure to ... forego that practice [would be] unmistakeable' ") (quoting *Thomas v. Review Bd.,* 450 U.S. 707, 717, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)). The result would be interference by the civil courts in the relationship among CrossLand, its pastor, and the church members, which the First Amendment prohibits. *See, e.g., Milivojevich,* 426 U.S. at 717, 96 S.Ct. 2372 (stating "questions of church discipline and composition of the church hierarchy are at the core of ecclesiastical concern").

We do not doubt that preserving client confidences revealed in the context of a professional counseling relationship serves an important public interest, as the duty the Legislature has imposed on such professionals reflects. *See* 22 TEX. ADMIN. CODE § 681.41(x). Maintaining patient confidentiality ensures that individuals receive effective and competent counseling when they need it. *See Abrams v. Jones,* 35 S.W.3d 620, 626 (Tex.2000) (citing *R.K. v. Ramirez,* 887 S.W.2d 836, 840 (Tex.1994) (stating that the basis for the privilege is twofold: to encourage the full communication necessary for effective treatment and to prevent unnecessary disclosure of highly personal information)). But however

highly we might rate the importance of that interest, it is by no means absolute when impingement on free-exercise rights results. *See Wisconsin v. Yoder,* 406 U.S. 205, 214, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). The values that underlie the constitutional interest in prohibiting judicial encroachment upon a church's ability to manage its affairs and discipline its members, who have voluntarily united themselves to the church body and impliedly consented to be bound by its standards, have been zealously protected. *See Watson,* 80 U.S. (13 Wall.) at 733–34; *see also Yoder,* 406 U.S. at 214, 92 S.Ct. 1526. When presented with conflicting interests like these, courts have generally held that "a spirit of freedom for religious organizations" prevails, *Kedroff,* 344 U.S. at 116, 73 S.Ct. 143, even if that freedom comes at the expense of other interests of high social importance. *See Yoder,* 406 U.S. at 214, 92 S.Ct. 1526; *see also Watchtower Bible & Tract Soc'y,* 819 F.2d at 883 (finding the practice of shunning "not to constitute a sufficient threat to the peace, safety, or morality of the community as to warrant state intervention," and stating "[i]ntangible or emotional harms cannot ordinarily serve as a basis for maintaining a tort cause of action against a church for its practices—or against its members."); *Simpson,* 494 F.2d at 493 (stating "[o]nly on rare occasions where there existed a compelling governmental interest in the regulation of public health, safety, and general welfare have the courts ventured into this protected area."); *Dean v. Alford,* 994 S.W.2d 392, 395 (Tex.App.-Fort Worth 1999, no pet.) (stating "the preservation of the free exercise of religion is deemed so important a principle it overshadows the inequities which may result from its liberal application").

Penley, citing *Casa View Baptist Church,* 134 F.3d 331, contends members of the clergy enjoy no constitutional pro-

tection for misconduct as professional marriage counselors simply because they may occasionally discuss scripture within the context of that relationship. In principle, we agree. *See Tilton,* 925 S.W.2d at 677. But *Sanders* involved an intentional tort that formed no part of the pastor's or his church's religious beliefs or practices. 134 F.3d at 336–37. In that case, Robyn Sanders and Lisa Mullanix sued Shelby Baucum, a minister at Casa View Baptist Church, for malpractice and breach of fiduciary duties as a marriage counselor by, among other things, encouraging and consummating a sexual relationship with each of them. *Id.* at 333. Baucum argued that his secular misconduct was not actionable because it occurred within two inherently ecclesiastical, rather than "purely secular," counseling relationships. *Id.* at 335. The court noted that the First Amendment does not categorically insulate religious relationships from judicial scrutiny because to do so would impermissibly extend constitutional protection to the secular components of these relationships and place religious leaders in a preferred position in our society. *Id.* at 335–36. The court held that the First Amendment does not require a minister's relationship with a parishioner to be purely secular in order for a court to review the propriety of the conduct that occurs within that relationship; rather, the First Amendment protects religious relationships between a minister and parishioner primarily by preventing the judicial resolution of ecclesiastical disputes that turn on matters of religious doctrine or practice. *Id.* at 336. The court stated that to invoke constitutional protection for conduct that occurred within the counseling relationship, "Baucum must assert that the specific conduct allegedly constituting a breach of his professional and fiduciary duties was rooted in religious belief." *Id.* at 338. Noting the

"obvious truth" that Baucum's actions could not be rooted in the church's religious beliefs and practices, the court held that Baucum could not hide behind First Amendment protections. *Id.*

In *Destefano v. Grabrian,* the Supreme Court of Colorado was similarly presented with conduct that occurred in the context of a counseling relationship between a member of the clergy and a congregant. 763 P.2d at 278. Robert and Edna Destefano sought marriage counseling from Grabrian, a Catholic priest for their diocese. *Id.* During the course of their counseling relationship, Grabrian developed a sexual relationship with Edna. *Id.* When the Destefanos filed suit for damages resulting from the sexual relationship Grabrian allegedly induced Edna into, Grabrian and the diocese contended the claims were constitutionally barred because a priest's performance of pastoral duties, including sacramental counseling of parishioners, is a matter of ecclesiastical concern. *Id.* at 283. The court noted that, "[i]f the alleged conduct of Grabrian was dictated by his sincerely held religious beliefs or was consistent with the practice of his religion, we would have to resolve a difficult first amendment issue." *Id.* at 284. But the court held that the conduct in issue clearly fell outside of the beliefs and doctrine of Grabrian's religion and was not entitled to constitutional protection. *Id.*

In the present case, Penley does not question that Westbrook's decision to reveal what she considered confidential information to the church elders was mandated by church doctrine and motivated by Westbrook's religious beliefs. Neither was his revelation an intentional tort that endangered Penley's or the public's health or safety. *See Watchtower Bible & Tract Soc'y,* 819 F.2d at 883 (stating the "intangible or emotional harms" that plaintiff suffered as a result of her shunning "are

clearly not of the type that would justify the imposition of tort liability for religious conduct. No physical assault or battery occurred"). Accordingly, Penley's claims are distinguishable from those asserted in *Sanders* and other cases that involve sexual assault of parishioners occurring in the context of what purports to be pastoral counseling. *See also Strock v. Pressnell,* 38 Ohio St.3d 207, 527 N.E.2d 1235, 1238 (Ohio 1988) (plaintiff alleged his minister engaged in sexual relations with his wife in the course of providing the couple with marriage counseling); *F.G. v. MacDonell,* 150 N.J. 550, 696 A.2d 697, 699 (N.J.1997) (parishioner sued for breach of fiduciary duty arising out of sexual contact in a pastoral-counseling relationship with her rector).

Penley's petition implies that her resignation from the church after she revealed confidences to Westbrook precludes any argument that Westbrook was performing a pastoral function in disseminating confidential information to the church. But clearly Westbrook's actions were grounded in religious doctrine. Westbrook's report to the church elders was an integral part of the church's three-step disciplinary process as described in CrossLand's letter to the congregation: "If the one in sin 'refuses to listen' ... then the instructions are to 'tell it to the church.'" The letter itself was disseminated to the congregation as the final step in the process: "Through their continuing sin, they forfeit their membership in the church, and the members of the church are to break fellowship with them." Penley's voluntary forfeiture of her membership did not, in CrossLand's or Westbrook's view, forestall the church's duty under its constitution to "tell it to the church" and admonish church members to "break fellowship with [Penley]." Their decision to so proceed was based on their interpretation of *Matthew* 18:15–20, an inherently ecclesiastical matter. We hold

that court interference with that decision through imposition of tort liability in this case would impinge upon matters of church governance in violation of the First Amendment. *See Milivojevich,* 426 U.S. at 713, 96 S.Ct. 2372 (noting that an inquiry into whether the church complied with church laws and regulations is prohibited by the First Amendment); *see also United Methodist Church, Baltimore Annual Conference. v. White,* 571 A.2d 790, 794 (D.C.1990) (stating "secular evaluation of the procedures that ecclesiastical or cannon law requires the church to follow is precisely the type of inquiry the First Amendment prohibits"); *Minker,* 894 F.2d at 1358–59 (holding civil courts lack jurisdiction to interpret provisions of the United Methodist Church's Book of Discipline governing pastoral appointments); *Hafner,* 616 F.Supp. at 737–39 (dismissing pastor's suit for alleged denial of benefits based on interpretation of the church synod constitution).

### G. Penley's Pleadings

Westbrook's plea to the jurisdiction challenges Penley's pleadings and not the existence of jurisdictional facts. Accordingly, we construe those pleadings in Penley's favor, taking as true the facts pled to determine whether subject-matter jurisdiction exists in this case. *See Miranda,* 133 S.W.3d at 226. If the pleadings affirmatively negate the existence of jurisdiction, a plea to the jurisdiction must be granted and repleading is not allowed. *Id.* at 227. In determining whether subject-matter jurisdiction exists, courts must look to the "substance and effect of a plaintiff's complaint to determine its ecclesiastical implication, not its emblemata." *Tran v. Fiorenza,* 934 S.W.2d 740, 743 (Tex.App.-Houston [1st Dist.] 1996, no pet.) (citing *Green v. United Pentecostal Church Int'l,* 899 S.W.2d 28, 30 (Tex.App.-Austin 1995, pet. denied) and *Natal v.*

*Christian & Missionary Alliance,* 878 F.2d 1575, 1577 (1st Cir.1989)). Here, it is clear from Penley's Second Amended Original Petition that her professional-negligence claim against Westbrook unconstitutionally impinges upon internal matters of church governance in violation of the First Amendment. Because Penley's pleading affirmatively negates the court's subject-matter jurisdiction, the trial court properly dismissed the case.

\* \* \*

Accordingly, we reverse the court of appeals' judgment and dismiss the case for want of subject-matter jurisdiction.