

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-22-00055-CV

---

TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER, TEXAS TECH UNIVERSITY SYSTEM, TEXAS TECH UNIVERSITY AND TEXAS TECH UNIVERSITY SYSTEM BOARD OF REGENTS, APPELLANTS

V.

PUREZA "DIDIT" MARTINEZ, APPELLEE

---

On Appeal from the 237th District Court
Lubbock County, Texas
Trial Court No. DC-2021-CV-0505, Honorable Les Hatch, Presiding

---

August 17, 2022

MEMORANDUM OPINION

Before QUINN, C.J., and PARKER, J., and PIRTLE, S.J.[1]

A claim of unlawful age discrimination underlies this appeal. Pureza "Didit" Martinez levied it against Dr. Tedd Mitchell, president of Texas Tech University Health Sciences Center (Center) and chancellor of Texas Tech University System. It emanated from his decision to discharge the seventy-two-year-old from her employ with the Center.

---

[1] Patrick A. Pirtle, Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

Sued were the Center, Texas Tech University, Texas Tech University System, and the Texas Tech University System Board of Regents. All but the Center filed a plea to the trial court's jurisdiction. Through it, they alleged both that sovereign immunity deprived the trial court of jurisdiction over Martinez's discrimination suit and she failed to exhaust administrative remedies. The trial court denied the plea, which resulted in this interlocutory appeal.[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (allowing a person to appeal from an interlocutory order granting or denying a plea to the jurisdiction filed by a governmental unit). We affirm and reverse in part.

### *Standard of Review*

Our Supreme Court explained the applicable standard of review when a movant challenges jurisdiction solely through attacking the allegations in a pleading. Its opinions doing so include *Westbrook v. Penley,* 231 S.W.3d 389, 394–95 (Tex. 2007). Since the plea to the trial court's jurisdiction at bar challenged Martinez's pleading, we apply the *Westbrook* standard here.

### *Grounds–Employee Relationship*

The first issue posed us is: "Did Martinez allege facts that would show sovereign immunity is waived against Appellants because they were also her 'employers' under the test set forth in *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142 (Tex. 1999)?" We answer yes and no.

Per statute, "[a]n employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer . . . discharges an individual, or discriminates in any other manner against an individual in connection

---

[2] The appellants are Texas Tech University, Texas Tech University System, and the Texas Tech University System Board of Regents. Unless otherwise specified, we refer to them collectively as TTU.

with compensation or the terms, conditions, or privileges of employment. TEX. LAB. CODE ANN. § 21.051(1). Furthermore, employers subject to liability for engaging in unlawful employment practices include "a county, municipality, state agency, or state instrumentality." *Id.* § 21.002(8)(D). Thus, governmental entities lose aspects of their immunity from damages when engaging in unlawful employment practices. *See id.* § 21.2585(b) (noting that punitive damages may be recovered but not from a governmental entity).

Despite references to an unlawful "employment" practice and "employer," the statute does not necessarily require the complainant to be an employee of the purported malfeasant. Rather, one has standing to seek relief under § 21.051 if the accused is an "employer" that, "using its position of power and control, adversely and wrongfully interfered with the plaintiff's employment relationship with a third party. *NME Hosps., Inc.*, 994 S.W.2d at 147. And, a plaintiff shows himself to have such standing by establishing that: (1) "the defendant is an employer within the statutory definition of the Act"; (2) "some sort of employment relationship exists between the plaintiff and a third party"; and (3) "the defendant controlled access to the plaintiff's employment opportunities and denied or interfered with that access based on unlawful criteria." *Id.* Allegedly, Martinez failed to aver facts satisfying this burden. But, before analyzing this contention, another needs attention.

The Texas Tech University System Board of Regents is a creature of statute charged with governing, controlling, organizing, and managing the Texas Tech University System. TEX. EDUC. CODE ANN. § 109.001(a), (c). Statute provides the venue for any suit filed "against the board or a member of [it] in the member's official capacity" as being Lubbock County. *Id.* § 109.005(a). That it does is telling. We so observe given the initial

3

argument posed by the Board of Regents. It contends that it is not a "separate suable entit[y]" apart from the Texas Tech University System. In other words, suits founded upon actions of the board and its members could only be initiated against the entity it or they supervise. If that were true, then what is the purpose of § 109.005(a), we ask rhetorically. Indeed, there would be no need to set venue for suits against the Board and its members if neither were susceptible to suit. Yet, the legislature set venue in suits against the board and its members. And, given the long-imposed obligation to afford meaning and effect to each clause, phrase, and word of a statute, *Eddins-Walcher Butane Co. v. Calvert*, 156 Tex. 587, 592, 298 S.W.2d 93, 96 (Tex. 1957), the only reasonable inference we can discern from the existence of § 109.005(a) is that the legislature envisioned the Board and its members as being susceptible to suit apart from the entities they oversee. So, we reject the Board's contention otherwise. With that, we turn to the next issue.

Again, the University System, its Board of Regents, and Texas Tech University assert that "[t]here are no pled allegations that Appellants meet the *Rennels* test for also being considered 'employers.'" We construe this as suggesting Martinez purportedly failed to aver facts in her petition illustrating that the three "were in a position to interfere with Martinez's employment" under *Rennels*. So construed, we agree and disagree with the proposition for the reasons that follow.

Turning to her live pleading, Martinez averred numerous statements. Among them were those explaining that the Center employed her as its president's chief of staff. Eventually, she came to serve under Dr. Mitchell while he performed dual roles in the University System. One as Center president, the other as University System chancellor.

According to Martinez, the Board of Regents became "'quite interested' in the age of the Center's "senior leadership" and relayed that to Mitchell. He, in turn, disclosed it to

4

Martinez and others via email. Through the latter, he said he "discussed with members of the [Board of Regents] . . . succession planning at both the [TTU System] as well as TTUHSC." The topic not only was "something they [the Board members] [were] quite interested in" but also was "timely because of the current economy." So, he "asked Steve Sosland to do an analysis of our current leadership, and the results illustrate[d] why this is necessary." "For members of our PEC [that is, the President's Executive Counsel], the average age [was] 60, 62% [were] eligible for retirement, and of those not yet eligible for retirement, 50% [would] be in the next 2-5 years." Martinez then alleged that "[o]ne month later, Dr. Mitchell . . . carried out the Board of Regents' request to reduce the age of senior leadership by firing Mrs. Martinez . . . for no justifiable reason, and appointed Coleman Johnson, a much younger white male, as interim Chief of Staff." In response to Martinez's efforts at securing an explanation, Mitchell said nothing "other than telling her that she 'could no longer serve as his Chief of Staff.'" Elsewhere she averred that he "set out to appease the Board of Regents and lower the average age of TTUHSC's President's Executive Council ("PEC") by firing Mrs. Martinez and replacing her with a younger white male."

Other allegations include (1) Martinez receiving a settlement offer to dispose of the matter in exchange for releasing the Center, University, and the Board of Regents (among others) from liability, (2) her rejection of same, (3) her complaining to the Texas Workforce Commission and Equal Employment Opportunity Commission, (4) the EEOC finding "reasonable cause to believe" she was "discharged . . . because of her age, 72, in violation of the ADEA," (5) all the "Defendants" asking the EEOC to reconsider its determination," (6) her accusation that the "**Defendants** illegally discriminated against her due to her age" and "worked diligently to keep this incident quiet," (7) Mitchell's representation that the

5

"University decided to move in a different direction," (8) the "**Defendants** and Dr. Mitchell, **acting on behalf of Defendants**, violated numerous University Policies, federal laws, and state laws, including but not limited to Chapter 21 of the Texas Labor Code," and (9) the "**Defendants** and Dr. Mitchell falsely accused Mrs. Martinez of misconduct, spread numerous false rumors about her, and illegally terminated her employment because of her age." (Emphasis added).

The Center is an entity distinct from Texas Tech University. TEX. EDUC. CODE ANN. § 110.01 (stating as much). Yet, it falls under the umbrella and control of the University System and Board of Regents. Statute dictates as much. The Board of Regents controls and manages the Center, *id.* § 110.01, and because it does, the Center falls under the auspices of the University System. *Id.* § 109.001(a) (stating that the University System "is composed of all those institutions and entities presently" governed and controlled by the Texas Tech University Board of Regents").[3] Moreover, the System itself is managed and controlled by the Board of Regents. *Id.* § 109.001(c). So, logically, the University System, through the Board of Regents, is in a legal position to regulate employment decisions of the Center given § 109.001(a) and (c) as well as § 110.01.

The pertinent standard of review obligates us to focus on Martinez's intent, read the petition liberally in her favor, and accept its allegations as true. *Westbrook*, 231 S.W.3d at 405; *Univ. of Tex.-Pan Am. v. Miller*, No. 03-10-00710-CV, 2013 Tex. App. LEXIS 10866, at *8 (Tex. App.—Austin Aug. 29, 2013, no pet.) (mem. op.). Reading the

---

[3] Reference is made in both § 109.001(a) and (c) to the "board of regents of Texas Tech University." That board, however, was renamed "the board of regents of the Texas Tech University System." TEX. EDUC. CODE ANN. § 109.001(c). No longer is there a Board of Regents of Texas Tech University but only a Board of Regents of the Texas Tech University System. And, the latter controls and manages the Texas Tech University System and the entities under the System's umbrella, such as the Center and Texas Tech University.

6

itemized allegations as prescribed by *Westbrook* in conjunction with the hierarchy constructed by § 109.001 and § 110.01, reasonably leads one to see the following picture painted by Martinez's live pleading. The University System, through its Board of Regents, decided to rid the Center of older employees due to financial concerns relating to their impending retirement. They then directed Mitchell to implement their policy. He did. Such, therefore, satisfies the third prong of *Rennels*; the System and Board purportedly "controlled access to the plaintiff's employment opportunities and denied or interfered with that access based on unlawful criteria." And, the authority cited us to the contrary is inapposite.

For instance, *Weeks v. Tex. A&M Univ.*, No. 3:16-CV-191, 2018 U.S. Dist. LEXIS 27907 (S.D. Tex. Feb. 21, 2018) (mem. op.), *aff'd, Weeks v. Tex. A&M Univ.*, 762 Fed. Appx. 203 (5th Cir. 2019), dealt with the identity of Weeks's "actual employer." *Id.*, 2018 U.S. Dist. LEXIS 27907, at *14–15 (observing that "the relevant inquiry here is who Weeks' actual employer was"). The identity of Martinez's actual employer matters not since the issue here concerns whether the System and Board of Regents were indirect employers per *Rennels*. As for *Johnson v. Scott Fetzer Co.*, 124 S.W.3d 257 (Tex. App.— Fort Worth 2003, pet. denied), it dealt with no statute expressly vesting the defendant, Scott Fetzer Co., with authority to manage and control Johnson's employer.

Yet, a deficiency in the live pleading does appear and it relates to Texas Tech University (Tech). Martinez said little about it or its involvement with the Center. Nor did she allege that, or describe how, it had input in, or sway over, whom the Center employs. At best, she merely suggested that Tech and the Center were under joint oversight by Mitchell (as University System Chancellor), the University System, and the Board of Regents. Missing are allegations concerning Tech's ability, de jure or de facto, to

7

influence or control any of the other entities or Mitchell. And, that Martinez merely included Tech within the category of "Defendants" does not fill the void. There remains an absence of allegations describing how Tech could, or did, exercise control over the Center in regard to her termination.

In short, Martinez met her burden by alleging facts permitting the exercise of jurisdiction over the University System and Board of Regents. The same is not true of Tech.

### Grounds–Exhaustion of Administrative Remedies

Next, we are told that Martinez failed to exhaust administrative remedies by neglecting to identify the University System, Board of Regents, and Tech as respondents in her TWC/EEOC complaint.[4] We disagree.

Statute required Martinez to include sufficient facts in her complaint to "enable the commission to identify the respondent." TEX. LAB. CODE ANN. § 21.201(c). The legislature defined "respondent" to mean "the person charged in a complaint" with engaging in impermissible conduct. *Id.* § 21.002(13). The actual names of those charged with misconduct need not be included so long as their identities can be determined from the allegations. *Overstreet v. Underwood*, 300 S.W.3d 905, 909 (Tex. App.—Amarillo 2009, pet. denied.) (concluding that an employer's name need not be specified).

Within the administrative complaint filed by Martinez, she alleged:

Dr. Mitchell, Chancellor of the University and President of TTUHSC, terminated me after over eleven years of faithful service because of my age, race, and gender. Days before I was improperly terminated and replaced by a younger white male, Dr. Mitchell sent an email to me and several others **stating that the Board of Regents was quite interested in the average**

---

[4] Given our disposition of the *Rennels* issue, whether administrative remedies were exhausted regarding the claim against Tech is irrelevant. So, we limit our discussion to the University System and the Board of Regents.

8

***age of the PEC's members***.  See Exhibit A.  Dr. Mitchell said that "[f]or members of our [President's Executive Council ("PEC")], the average age is 60, 62% are eligible for retirement, and of those not yet eligible for retirement, 50% will be in the next 2-5 years."  Dr. Mitchell promised to be "quite intentional" in reducing the age of the PEC ***to appease the Board of Regents***.  *Id.*  Shortly after that, Dr. Mitchell improperly terminated me based upon false accusations, promoted Mr. Johnson, a much younger white male, and lied to my colleagues in an attempt to cover up the discrimination, stating that I left to take care of my disabled husband.  ***Dr. Mitchell fired me to appease the Board of Regents*** and lowered the average age of senior leadership at TTUHSC and replaced me with a younger white male.  Alternatively, by his own admission, Dr. Mitchell terminated me under the guise of having to take care of my disabled husband.  Either way, Dr. Mitchell's actions ***on behalf of the University and TTHUSC*** [sic] violated the University and TTUHSC's policies, state laws, and federal laws.

(Emphasis added).  Earlier in the same document she also identified the actors who committed the "harm" as "Dr. Tedd Mitchell, ***Chancellor of Texas Tech University System (the 'University'***) and President of Texas Tech University Health Sciences Center ('TTUHSC')."  (Emphasis added).  As can be seen, Martinez expressly named Mitchell as the one who effectuated the decision to terminate.  Yet, she rather clearly implicated the Board of Regents when averring that he acted to "appease" it.  Furthermore, her implication of the University System into the scheme can be inferred from the reference to Mitchell as Chancellor for the University System.  In other words, one can infer from the allegations that Mitchell wore the hat of both Center president and University System Chancellor when acting to appease the Board of Regents by reducing the age of those on his executive committee.

To invoke a rather old truism, we presume that everyone knows the law.  *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 n.3 (Tex. 1990).  Thus, one reading her complaint on behalf of the EEOC would know that statute both (1) placed the Center under the umbrella of the University System and (2) designated the Board of Regents as

9

the body governing the University System and the Center. That knowledge coupled with the accusations in the complaint were enough to identify Mitchell, the Board of Regents, and the University System through the System's Chancellor and its Board of Regents as the ones Martinez charged with misconduct; it was enough to lead the EEOC to identify them as some "respondents" among others.

In sum, we conclude that the plea to the jurisdiction should have been granted as to Texas Tech University but not as to the other movants. Thus, we reverse the trial court's decision to the extent that it did not dismiss the suit against Tech but affirm the remainder. So too do we remand this cause to the trial court for entry of an order dismissing Texas Tech University if Martinez cannot amend her petition within a reasonable time set by the trial court to aver sufficient jurisdictional facts against Texas Tech University. *See Tex. S. Univ. v. Mouton*, 541 S.W.3d 908, 912 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (stating that "[u]nless the petition affirmatively demonstrates that no cause of action exists or that plaintiff's recovery is barred, the trial court is required to give the plaintiff an opportunity to amend before granting a motion to dismiss").


Brian Quinn
Chief Justice


10