# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00393-CV

**Guadalupe-Blanco River Authority, Appellant**

**v.**

**Texas Attorney General; San Antonio Water System; Texas Commission on Environmental Quality; Cibolo Creek Municipal Authority; The Aransas Project; New Braunfels Utilities; San Antonio River Authority; KOC Land, LP; O'Connor Brothers River Ranch, LLC; Ballinamona-Gafney, LP; Ballinamona, LP; Braman Ranches, LLC; Wexford Cattle Co., LLP; Martin O'Connor Ranch Ltd.; and Martin O'Connor Cattle Company, Inc., Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT NO. D-1-GN-14-001198, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## M E M O R A N D U M  O P I N I O N

The Guadalupe-Blanco River Authority (the "Authority") filed a suit under what is commonly referred to as the Expedited Declaratory Judgment Act (the "Act"). *See* Tex. Gov't Code §§ 1205.001-.152 (containing provisions of Act); *see also id.* § 1205.042 (stating that copy of petition "shall be served on the attorney general" before trial). In its suit, the Authority sought "to clear the way for a much-needed water project in the Lower Guadalupe River Basin" and to obtain the revenue needed for that project. According to the Authority, the project will add off-channel storage and increase the amount of water than can be supplied annually through its canal system and sold to its customers. Moreover, the Authority suggests that the project will cost $100 million and will provide 100,000 acre-feet of water per year.

In its petition, the Authority alleged that the San Antonio Water System (the "System") improperly filed an application with the Texas Commission on Environmental Quality (the "Commission") that would significantly diminish the amount of water available for the project by allowing the System to reuse effluent that it had previously used and discharged.[1] Moreover, the Authority urged that the System's proposed water use would not comply with the governing provisions of the Edwards Aquifer Authority Act. *See* Act of May 30, 1993, 73d Leg., R.S., ch. 626, §§ 1.01-4.03, 1993 Tex. Gen. Laws 2350, 2350-72 (containing provisions of Edwards Aquifer Authority Act, including definition for "reuse"). Accordingly, the Authority alleged that the System's application "creates a cloud over" the revenue pledge made by the Authority to secure bonds to pay for its project because there will be less water available to sell to its customers. *See* Tex. Gov't Code § 1205.001(2) (defining "[p]ublic security" as "including a bond"). For these reasons, the Authority filed the underlying suit in order to guarantee that its water supply and revenue will remain adequate for the project.

In response to the Authority's petition, the System, the Commission, and various other interested parties[2] filed pleas to the jurisdiction contending that the district court did not have

---

[1] In its application, the System sought to "convey and reuse return flows derived from privately owned groundwater as authorized by section 11.042(b) of the Texas Water Code. [The System] intends to reuse 50,000 acre feet of its . . . authorized return flows."

[2] The following entities also filed pleas to the jurisdiction and are appellees in this case: Cibolo Creek Municipal Authority; The Aransas Project; New Braunfels Utilities; San Antonio River Authority; KOC Land, LP; O'Connor Brothers River Ranch, LLC; Ballinamona-Gafney, LP; Ballinamona, LP; Braman Ranches, LLC; Wexford Cattle Co., LLP; Martin O'Connor Ranch Ltd.; and Martin O'Connor Cattle Company, Inc. Although the attorney general was named as a party, *see* Tex. Gov't Code § 1205.042, the attorney general neither supported nor attacked the relief sought by the Authority. Similarly, on appeal, the attorney general has chosen not to file a brief in this matter.

jurisdiction over the Authority's suit because its claims are not ripe, because the claims do not fall within the Act, because the Commission has exclusive or primary jurisdiction over the controversy, and because the claims are barred by sovereign immunity.

After considering the various pleas and responses, the district court determined "that each and all of the Pleas to the Jurisdiction should be granted in all things" and dismissed the case "in its entirety." *See id.* § 1205.065 (requiring trial courts to determine "each legal or factual question in the declaratory judgment action" and render final judgment "with the least possible delay"). Shortly after the district court made its ruling, the Authority filed this expedited appeal. *See id.* § 1205.068 (authorizing appeals of trial court rulings and providing that appeals are governed by rules for accelerated appeals); *see also* Tex. Civ. Prac. & Rem. Code §§ 51.014(a)(8) (governing appeals from rulings granting or denying plea to jurisdiction "by a governmental unit"), 101.001(3) (defining governmental unit). We will affirm the district court's judgment dismissing the Authority's suit.

## STANDARD OF REVIEW

Appellate courts perform a de novo review of a trial court's ruling on a plea to the jurisdiction. *See Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007); *see also Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004) (explaining that "[a] plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction"). When performing this review, courts look to the plaintiff's petition to determine "whether the facts pled affirmatively demonstrate that jurisdiction exists." *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007). "If the pleadings are insufficient to establish jurisdiction but do not affirmatively demonstrate an incurable

3

defect, the plaintiff should be afforded the opportunity to replead." *Id.* at 643. However, if "the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004). When, as here, "an action is grounded in statute, subject matter jurisdiction must be shown under the applicable statute." *Arnold v. Price*, 365 S.W.3d 455, 459 (Tex. App.—Fort Worth 2011, no pet.).

Resolution of the issues presented in this appeal involves the construction and interpretation of the Act, which is a legal question that is reviewed de novo. *See Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). When performing this analysis, our primary objective is to give effect to the legislature's intent. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). In ascertaining that intent, we look first and foremost to the statutory text, *see id.*, and we rely on the plain meaning of the text unless a different meaning is provided by the legislature or unless enforcing the plain language would lead to absurd results, *see Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009).

**DISCUSSION**

As set out above, the Authority filed this suit under color of the Act, and the System, the Commission, and the other parties all filed pleas to the jurisdiction alleging, among other things, that the suit must be dismissed because the suit exceeds the scope of the Act. The System's intention to reuse effluent as well as the effect that reuse will have on the water supply available for use by the Authority and on the economic viability of the project formed the basis for the relief sought from the district court, and they frame this appeal as well. On appeal, the Authority attacks the

jurisdictional grounds that were urged in the various pleas to the jurisdiction and that formed the basis for the district court's ruling.

When arguing on appeal that the district court erred by granting the pleas, the Authority urges that its suit and requested declarations fall within the scope of the Act.[3] Generally speaking, the Authority notes that the Act was designed "to provide a method of adjudicating the validity of public securities in an efficient and quick manner," *see Friends of Canyon Lake, Inc. v. Guadalupe-Blanco River Auth.*, 96 S.W.3d 519, 528 (Tex. App.—Austin 2002, pet. denied), highlights that suits under the Act are proceedings "in rem," *see* Tex. Gov't Code § 1205.023(1); *see also Alejos v. State*, 433 S.W.3d 112, 117 (Tex. App.—Austin 2014, no pet.) (discussing how phrase "in rem" would typically concern "adjudication of the legal status of the securities themselves and not merely the personal rights of specific parties before the court"), and urges that the language of the Act is broadly written, *see Determan v. City of Irving*, 609 S.W.2d 565, 568 (Tex. Civ. App.—Dallas 1980, no writ) (discussing predecessor to Act and concluding that consideration of effect of amendment to city's charter "was necessarily involved in determining what authority the City of Irving has to issue and deliver its bonds").

More specifically, the Authority insists that in its petition, it explained that the project was necessary to provide an adequate water supply and to assure its municipal and industrial

---

[3] On appeal, the Authority contends that the relief that it sought is not dissimilar from those considered in a prior set of cases from this Court. *See Bexar Metro. Water Dist. v. City of San Antonio*, 228 S.W.3d 887 (Tex. App.—Austin 2007, no pet.); *Bexar Metro. Water Dist. v. City of Bulverde*, 234 S.W.3d 126 (Tex. App.—Austin 2007, no pet.); *Bexar Metro. Water Dist. v. City of Bulverde*, 156 S.W.3d 79 (Tex. App.—Austin 2004, pet. denied). However, none of those cases involved suits under the Act.

customers of its ability to enter into long-term-water-commitment contracts.[4]  Also, the Authority points to allegations made in its petition regarding the alleged impact that the System's application will have on the Authority's project.  In particular, the Authority urges that if the System's application is granted, the amount of water available for the project "would amount to only roughly half" of the water needed to cover the cost of the bonds but that the full amount of water needed would be available if the System is not permitted to reuse discharged water by later reclaiming it.  Stated differently, the Authority contends that if the System is allowed to proceed with its planned use, then the bond authorization by the Authority would be invalid "because the $100 million expenditure cannot result in the required total" water supply necessary to cover the cost of constructing the project.

Building on the potential impact of the System's intention to reuse effluent, the Authority contends that its "prospective customers and the bond market need judicial resolution of" its authority to issue the public securities to pay for the project and assurance that the bond resolution is legal and valid, that the water-supply contracts from which it will derive revenue can be legally executed and will be valid, that the Authority can impose its planned rate, and that its proposed expenditures relating to the bonds are legal and valid.  In addition, the Authority notes that through the bond resolution it has pledged its revenues from its water contracts and its right to "divert, use, and sell state water" and that it has asked the district court to determine whether those pledges are proper. *See Ex parte City of Irving*, 343 S.W.3d 850, 854-58 (Tex. App.—Dallas 2011, pet. granted,

---

[4] Specifically, the Authority alleged that its "municipal and industrial customers need [the Authority] to commit to supply defined amounts of water on a firm basis under long-term contracts" and that "purchasers of Bonds want assurance that the amounts of water committed by contract to be supplied on a firm basis will continue to be firm throughout that term."  According to the Authority, a water supply is "firm" if it is "reliable each and every day throughout a drought at least as severe as the most-severe drought of record in the region."

judgm't vacated w.r.m.) (considering under Act whether city's proposal to pledge tax revenues for 10 years fell under exception to biennial appropriation requirement and whether city could pledge State's portion of mixed beverage taxes).

Regarding the declarations sought from the district court, the Authority requested the following:

(1) that each public security authorization relating to the Lower Basin Project Bonds is legal and valid, *see* TEX. GOV'T CODE § 1205.021(2), including without limitation the determination to construct "off-channel reservoir storage . . . to provide a total firm water supply of not less than 100,000 acre-feet per year utilizing the GBRA-Dow Lower Basin Run-of River Water Rights";

(2) that all treated wastewater derived from water withdrawn from the Edwards Aquifer, if discharged or otherwise allowed to flow into a watercourse, lake, or other body of state-owned water: (i) may not be reused pursuant to Section 11.042(b) of the Water Code or otherwise; and, therefore, (ii) is and shall remain state-owned water and part of the run-of-river flow of that watercourse to which state-issued water rights are entitled in the order of their respective priority dates[; and]

(3) that all treated wastewater derived from water withdrawn from the Edwards Aquifer, if lawfully reused (i.e., before it is discharged or otherwise allowed to flow into a watercourse, lake, or other body of state-owned water), must be so used within the boundaries of the [Edwards Aquifer Authority][.]

In addition, the Authority sought "a decree, pursuant to" the Act "that the declaratory judgment herein prayed for shall, as to all matters adjudicated, be forever binding and conclusive" to the parties to the suit as well as "all Interested parties, irrespective of whether such parties filed an answer or otherwise appeared."

Although the Authority contends that the Act is broadly worded and that the relief that it requested is available under the Act, we believe that the Authority's reliance on the Act is

misplaced. The Act was promulgated "to provide issuers of public securities . . . a method of quickly and efficiently adjudicating the validity of public securities and acts affecting those public securities." *Hotze v. City of Houston*, 339 S.W.3d 809, 814 (Tex. App.—Austin 2011, no pet.); *see also Buckholts Indep. Sch. Dist. v. Glaser*, 632 S.W.2d 146, 149 (Tex. 1982) (explaining that purpose of promulgating Act was to prevent "one disgruntled taxpayer" from stopping "the entire bond issue by simply filing suit"). The Act "allows an issuer to bring a special, expedited declaratory judgment action to validate proposed public securities or to resolve any disputes relating to public securities." *Hotze*, 339 S.W.3d at 814 (citing Tex. Gov't Code § 1205.021). In general, a suit under the Act is "binding on all persons who own property or reside within the boundaries of the issuer." *Id.* (citing Tex. Gov't Code § 1205.023).

Moreover, the Act only allows issuers to seek declarations regarding a limited set of topics. In particular, under the Act, an "issuer may bring an action . . . to obtain a declaratory judgment" regarding the following:

(1) the authority of the issuer to issue the public securities;

(2) the legality and validity of each public security authorization relating to the public securities, including if appropriate:

(A) the election at which the public securities were authorized;

(B) the organization or boundaries of the issuer;

(C) the imposition of an assessment, a tax, or a tax lien;

(D) the execution or proposed execution of a contract;

8

(E) the imposition of a rate, fee, charge, or toll or the enforcement of a remedy relating to the imposition of that rate, fee, charge, or toll; and

(F) the pledge or encumbrance of a tax, revenue, receipts, or property to secure the public securities;

(3) the legality and validity of each expenditure or proposed expenditure of money relating to the public securities; and

(4) the legality and validity of the public securities.

*See* Tex. Gov't Code § 1205.021; *see also id.* § 1205.001(1) (specifying that "'[i]ssuer' means an agency, authority, board, body politic, commission, department, district, instrumentality, municipality or other political subdivision, or public corporation of this state"), (2) (providing that "'[p]ublic security' means an interest-bearing obligation, including a bond"), (3) (defining "[p]ublic security authorization" as "an action or proceeding taken, made, or proposed to be taken or made in connection with or affecting a public security").

In its brief, the Authority attempts to characterize its claims and requested declarations as falling within these permissible categories, but the relief sought and the language of the declarations in dispute reveal that this appeal does not concern whether the Authority has the authority to issue the public securities, whether the securities were properly authorized, whether the procedures for issuing the securities were complied with, or whether the securities and the related proposed expenditures are legal and valid. *See id.* § 1205.021. In other words, the requested declarations in this case do not seek judicial approval regarding the legality and validity of the Authority's bonds or the procedures that were used when issuing the bonds.

9

On the contrary, the declarations sought by the Authority are based on the continued availability of water returned to the Guadalupe River by the System and seek to guarantee that the project has a supply of water that the Authority considers adequate. The Authority seeks to achieve those assurances by pursuing a judicial determination regarding whether the System's desire to reuse discharged water and its requested permit are inconsistent with the Edwards Aquifer Authority Act. Moreover, the Authority is asking that this determination be made before the Commission has had an opportunity to fully consider and rule on the Authority's request in an administrative proceeding. Unquestionably, the Authority would like the security and certainty sought through those declarations, but we are not persuaded that the claims and requests concerning the availability of water for the project and any potential impact that might occur from issuing the System its requested permit can fairly be construed as bearing on the "legality and validity" of the bonds at issue as those terms are used in the Act. *See id.*; *see also Black's Law Dictionary* 618, 1075 (6th ed. abridged 1991) (defining "valid" as having "legal strength or force" and having been "executed with proper formalities, incapable of being rightfully overthrown or set aside" and "legal" as "conforming to the law; according to the law; required or permitted by law; not forbidden or discountenanced by law; good and effectual in law"); *see also Ex parte City of Corpus Christi*, 427 S.W.3d 400, 406 (Tex. App.—Corpus Christi 2013, pet. denied) (considering under Act whether city's proposed road-construction project complied with language of bond proposition approved by voters); *Leonard v. Cornyn*, 47 S.W.3d 524, 528 (Tex. App.—Austin 1999, pet. denied) (explaining that predecessor to Act was "designed to provide an orderly, efficient system for assuring that the bonds have been issued with the requisite authority and in compliance with what the law requires").

In much the same way that unexpected or unforeseen changes in the weather might impact the ability of the Authority to meet the requirements of its bonds, the actions proposed by the System through its permit application might affect the amount of water available to the Authority, but they do not bear upon the procedural requirements that must be met for the bonds to be legal and valid or the Authority's ability to issue the bonds. This remains true even though the availability of the desired water was specifically mentioned in the bond resolution.[5] Although a trial court might be able to consider the validity and legality of a pledge of water rights as part of a bond authorization, we are not persuaded that the trial court could properly address under the Act whether those rights will secure a particular amount of water or whether the decision to pledge those rights is a wise one. Those types of declarations would not seem to fall within the limited scope of the Act.[6]

---

[5] We do note that although the Authority contends on appeal that the bond resolution was premised on water availability, the language of the resolution seems to speak more in terms of guaranteeing that the Authority will charge a rate to its customers that will ensure that there is enough money to pay off the bonds. Accordingly, by its terms, that pledge could seemingly be satisfied regardless of whether the desired amount of water is present because the Authority could raise its rates to ensure that there were sufficient funds to cover the bonds. *See* Act of May 21, 1975, 64th Leg., R.S., ch. 433, § 1, sec. 9, 1975 Tex. Gen. Laws, 1149,1153-54 (empowering Authority to establish and set rates sufficient to produce revenue to cover its obligations). The issue of whether the Authority has the legal ability to pledge revenue to satisfy the bond is not before us in this appeal.

[6] In addition to the three declarations discussed above, the Authority's petition also contains a request for the following five declarations:

(1) that [the Authority] is authorized to issue the Lower Basin Project Bonds; and that the Lower Basin Project Bonds, when issued and executed pursuant to the procedural requirements by law and the authorizing proceedings of [the Authority], including approval by the Attorney General of Texas, constitute lawful and valid obligations and contracts of [the Authority], enforceable according their respective terms, and that all provisions for the payment of, and pledges, liens, and security provided for such debt and the interest thereon constitute valid and binding obligations and contracts of [the Authority] under the laws of the State of Texas and that the Lower Basin Project Bonds have been confirmed and approved by this Court;

11

This more limited construction of the reach of the Act is consistent with other provisions in the Act as well. For example, section 1205.151 of the Act describes the effect of a judgment obtained under the Act and sets out the types of judgments that may be issued by a trial court. Specifically, the section states that it applies to final judgments under the Act that hold the following:

> (1) the issuer had or has the authority on the terms set out in the issuer's petition to:
>
>> (A) issue the public securities; or
>>
>> (B) take each public security authorization; and

---

> (2) that the proposed expenditures of money relating to the Lower Basin Project Bonds are legal and valid;
>
> (3) that the Lower Basin Project Bonds themselves are legal and valid;
>
> (4) that, upon final approval by the Attorney General of Texas, the proceedings described herein made in connection with the issuance of the Lower Basin Project Bonds are valid and authorized by applicable laws; and
>
> (5) that [the Authority] may, in the future, make changes and amendments to the Lower Basin Project Bonds, as may be necessary or appropriate, so long as the changes are approved by the Attorney General of Texas.

Arguably, the language of these requests would seem to fall more squarely within the bounds of the Act provided that the bases for the requests do not exceed the permissible scope. However, these additional requests do not form the basis of this appeal, and the Authority has not specifically asked this Court to address these declarations or remand these declarations in the event that the other requests are deemed to exceed the scope of the Act. On the contrary, in its conclusion, the Authority only asks this Court to reverse the trial court's judgment and remand the proceeding to allow the district court to construe the Edwards Aquifer Authority Act in the manner that it suggested to ensure that there is a sufficient amount of water available to finance the project through the bonds. Accordingly, we need not express any comment on whether these other declarations could have properly been considered by the district court.

12

> (2) each public security authorization and expenditure of money relating to the public securities was legal.

Tex. Gov't Code § 1205.151(a). By the terms of section 1205.151, the authorized judgments concern whether the requirements for issuing public securities and for disbursing or using money pertaining to the securities were complied with and do not address the effect that the activities of another party might have on the ability of the issuer to fulfill those obligations. *Id.*[7]

Moreover, section 1205.151 also contains a rather unusual provision binding the parties named in the suit and those described by the Act as well as precluding future claims that could have been but were not presented. Specifically, the section states that "[t]he judgment, as to each adjudicated matter and matter that could have been raised, is binding and conclusive against" the comptroller, the attorney general, the issuer, and any party named and served or described by the Act. *Id.* § 1205.151(b); *see also id.* § 1205.151(c) (stating that judgment is permanent injunction against future filing contesting validity of securities, security authorizations, expenditures of money related to securities, provisions made for payment of securities, and "any adjudicated matter and any

---

[7] When arguing that the district court had jurisdiction over its claims, the Authority points to subsection 1205.024(8) of the Act. *See* Tex. Gov't Code § 1205.024(8). That section sets out the required contents for a petition filed under the Act, and the subsection states that the petition must set out "any other pertinent matter." *Id.* In light of this language, the Authority urges that the Act contemplates claims like those that it made in this case, which might not appear at first blush to fall under a more typical "legality and validity" inquiry. However, given that the section's scope is limited to the contents of the petition, does not expressly authorize claims beyond those mentioned in section 1205.021, *id.* § 1205.021, and lists only items for inclusion that are relevant to the legality and validity of a public security, *id.* § 1205.024(1)-(7) (requiring petition to set out issuer's authority to issue securities, purpose of security at issue, results of required elections, copy of security authorization, amount of security, interest rate for security, and authority relating to creation of issuer or to boundary change if relevant), we are not persuaded that the language relied on by the Authority expands the scope of the Act in the manner suggested.

13

matter that could have been raised in the action"). If the Authority is correct that claims beyond those more typically concerned with the legality and validity of public securities may be addressed under the Act, then claims not presented when a more typical suit under the Act was filed would be precluded from subsequent litigation even though they involved parties and subject matters that did not pertain to the legality and validity of the securities under review. We do not believe that the legislature could have intended that result and instead believe that the legislature only intended to foreclose future challenges that could have been presented in the suit regarding the authority of the entity to issue securities and the legality or validity of the actual securities.

Furthermore, we believe that our limited construction is supported by section 1205.061 of the Act. Section 1205.061 allows an issuer to request the trial court to "enjoin the commencement . . . of any proceeding" that is related to a suit filed under the Act. *See id.* § 1205.061. In particular, the provision states that a trial court may enjoin a proceeding "that contests the validity of" the following:

> (1) any organizational proceeding or boundary change of the issuer;
>
> (2) public securities that are described in the petition for declaratory judgment action;
>
> (3) a public security authorization relating to the public securities;
>
> (4) an action or expenditure of money relating to the public securities, a proposed action or expenditure, or both;
>
> (5) a tax, assessment, toll, fee, rate, or other charge authorized to be imposed or made for the payment of the public securities or interest on the public securities; or
>
> (6) a pledge of any revenue, receipt, or property, or an encumbrance on a tax, assessment, toll, fee, rate, or other charge, to secure that payment.

14

*Id.* § 1205.061(a). As set out above, when discussing the types of proceedings that may be enjoined, the legislature chose to provide a circumscribed list similar to the set of declarations that may be pursued under the Act. *Id.*

In addition to concluding that the terms of the Act as a whole support our limited construction, we also believe that our determination that the Act is not designed to address the issues presented by the Authority is supported by the possibility that the requested relief and declarations would not guarantee the Authority the amount of water that it believes it needs to cover the costs of the project. As mentioned above, the amount of water that the Authority is able to use and sell is dependent on some factors that are beyond the control of any entity withdrawing water from the river as well as the decision by other entities to continue discharging their groundwater-based effluent into the river. Although we do not attempt to outline the full impact of the desired declarations here, we do note that it seems logical to assume that the System could bypass the effect of the requested declarations by not releasing its effluent back into the river system. If that were the case, the Authority would be confronted with the same reduction in supply that it is purportedly confronting and attempting to ameliorate now.

In light of the preceding, including the plain language of the governing statutory provisions, and after reviewing the petition, including the claims and declarations at issue as well as the relief sought, we cannot conclude that the district court erred when it determined that the Authority's suit exceeded the scope of the Act. Accordingly, we conclude that the district court properly granted the pleas and dismissed the suit on that ground. Having determined that the district court properly dismissed the suit on that basis, we need not address the remaining jurisdictional

arguments presented to the district court. Moreover, because the Authority's pleadings affirmatively negated the existence of jurisdiction in this case, the Authority is not entitled to an opportunity to amend its pleadings.

## CONCLUSION

Having determined that the district court did not err by dismissing the Authority's suit, we affirm the judgment of the district court.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed: February 26, 2015