

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00208-CV

———————————————————

IN RE TEXAS CONFERENCE OF SEVENTH-DAY ADVENTISTS, SOUTHWESTERN UNION CONFERENCE CORPORATION OF SEVENTH-DAY ADVENTISTS, TEXAS CONFERENCE ASSOCIATION OF SEVENTH-DAY ADVENTISTS, AND ALICE CASH, Relators

---

Original Proceeding
48th District Court of Tarrant County, Texas
Trial Court No. 048-313499-19

---

Before Kerr, Womack, and Wallach, JJ.
Opinion by Justice Wallach

# OPINION

Relators the Texas Conference of Seventh-Day Adventists (the Conference), the Southwestern Union Conference Corporation of Seventh-Day Adventists (the Union), the Texas Conference Association of Seventh-Day Adventists (the Association), and Alice Cash (Cash) seek a writ of mandamus compelling the trial court to (1) vacate its April 29, 2022 order denying their motion to reconsider and (2) grant their plea to the jurisdiction. Because we hold that the ecclesiastical abstention doctrine applies, we will conditionally grant Relators' requested relief.

## I. The Parties

The real party in interest is Fort Worth Northwest Seventh-Day Adventist Church (the Northwest Church), which claims to be a religious nonprofit organization having its primary place of worship in Tarrant County, Texas. *See* Tex. Bus. Orgs. Code Ann. §§ 252.001–.018. Under the *Seventh-Day Adventist Church Manual*, it is—or was—a "local church," that is, "[a] group of members in a defined location that has been granted, by the constituency of a conference in session, official status as a church."[1]

Cash was a treasurer for the Northwest Church. Whether she remains the Northwest Church's treasurer is disputed. The Conference is a "local conference," which, according to the *Church Manual*, is an organized "group of local churches[]

---

[1]Our record contains the nineteenth edition of the *Church Manual.*

2

within a defined geographical area." The Union is a "union conference," which, again according to the *Church Manual,* is a "group of conferences[ ] within a defined geographical area." Where the Association fits in the hierarchy or what its role is within that hierarchy is not clear.[2]

For this opinion's purposes, to simplify the discussion, we refer to the dispute as being between the Northwest Church and the Conference—the Northwest Church's immediate hierarchical authority. The Northwest Church appears to have sued the Union, the Association, and Cash because of their entanglement in the dispute between the Church and the Conference following the Conference's termination of the Northwest Church's pastor.

## II. The Northwest Church's Grievance Against the Conference

We rely on the Northwest Church's first amended petition to define the nature of the dispute between it and the Conference.

Joe Gresham became the Northwest Church's pastor in 1992 and remained its pastor for over twenty-six years. According to the Northwest Church, in addition to being its pastor, Gresham was also the pastor of the Weatherford Seventh-Day Adventist Church (the Weatherford Church).

---

[2]The *Church Manual* also describes the General Conference, which "represents the worldwide expression of the Church." The General Conference has regional offices known as "divisions of the General Conference."

Around 2002, however, the Conference removed Pastor Gresham as the Weatherford Church's pastor and cut his pay in half. To supplement Pastor Gresham's pay, the Northwest Church created a special fund. The Northwest Church forwarded these funds to the Conference, which then made the requisite withholdings; the Conference's payroll department then paid the balance to Pastor Gresham. Subsequently, in 2010, the Conference reinstated Pastor Gresham as the Weatherford Church's pastor. The Conference did not, however, increase Pastor Gresham's pay.

According to the Northwest Church, in 2013, the Conference forced Pastor Gresham to retire with the understanding that he would continue to pastor both churches. In return, Pastor Gresham was supposedly to receive a stipend. The stipend, however, never materialized, and when Pastor Gresham inquired about it, the Conference purportedly asserted that he was mistaken about any stipend. Despite the misunderstanding, Pastor Gresham continued to pastor both churches.

In December 2018, the Conference terminated Pastor Gresham "based on noncompliance with NAD/TXC policies."[3] The Northwest Church is not disputing Pastor Gresham's termination.[4] Like falling dominoes, a series of events followed.

---

[3]The noncompliance was with the policies of the North American Division and the Texas Conference.

[4]The *Church Manual* provides, "Pastors or assistant pastors are not nominated or elected to such positions by the church. Their connection with the church is by

4

After Pastor Gresham's termination, the Northwest Church dissolved its existing governing board and, in January 2019, unanimously elected a new governing board. The newly elected board then voted to dissolve Pastor Gresham's special fund, to allow anyone who had contributed to the fund to withdraw their offerings by January 31, 2019, and to give any remaining funds to Pastor Gresham.

One day before the January 31, 2019 deadline, however, according to the Northwest Church, the Conference "confiscated [the Northwest Church's] finances." The Northwest Church alleged that Cash, the treasurer under the previous Northwest Church's governing board (but whose name had not been removed from the Northwest Church's bank account), had written a check payable to the Conference that effectively exhausted the Northwest Church's account. The Northwest Church maintains that all the funds belonged to it, not to the Conference.

Apparently in response to this move, the Northwest Church's governing board then voted to close the Northwest Church's savings account in the Union so that it could continue to operate and pay bills. Complying with the Northwest Church's wishes, the Union wrote a check payable to the Northwest Church, but when the Northwest Church tried to deposit the check, the Northwest Church discovered that the Conference had placed a "stop payment" on it.

appointment of the conference committee, and such appointments may be changed at any time."

In addition to losing access to its funds, the Northwest Church also lost access to its place of worship. When the Northwest Church's clerk and head deacon went to the church building on February 21, 2019, they encountered a locksmith changing the locks along with representatives from the Conference. The Northwest Church lamented, "To date, [the Northwest Church's] members, who built and paid for the church, remain locked out of their place of worship and above each door a sign reads: 'POSTED — NO TRESPASSING — KEEP OUT.'"

The Northwest Church sued the Conference and sought injunctive relief, declaratory relief, damages for theft of property, damages for conversion, damages for money had and received, exemplary damages, and attorney's fees. Within its petition, the Northwest Church acknowledged that it was suing "its parent organizations." And it based its complaints on the Conference's failure to follow the *Church Manual.* Specifically, it alleged, "[The Northwest Church] will further show that the *nonsecular* provisions of the [*Church Manual*] are binding upon [the Northwest Church] and [the Conference] and provide that the right to ownership and use of the subject local church funds and personal property is vested in [the Northwest Church]."[5]

The Conference filed an answer that it later amended three times. On March 4, 2020, it filed a plea to the jurisdiction and, on June 19, 2020, an amended plea to the

---

[5]"Nonsecular" is defined as "[r]elating to or involving religious or spiritual matters." Oxford English Dictionary, https://www.lexico.com/en/definition/nonsecular (last visited July 13, 2022).

jurisdiction. On July 28, 2020, the trial court denied the Conference's amended plea to the jurisdiction.

Over nineteen months after the July 28, 2020 order, on March 7, 2022, the Conference filed a motion to reconsider, which the trial court denied about seven weeks later, on April 29, 2022. The Conference now seeks mandamus relief against the April 29, 2022 order. The case is set for trial in late August 2022.

### III. Mandamus Standard of Review

Mandamus relief is appropriate when the trial court lacks subject-matter jurisdiction. *In re Diocese of Lubbock*, 624 S.W.3d 506, 512 (Tex. 2021) (orig. proceeding) (citing *In re Crawford & Co.*, 458 S.W.3d 920, 929 (Tex. 2015) (orig. proceeding), and *In re Entergy Corp.*, 142 S.W.3d 316, 321 (Tex. 2004) (orig. proceeding)), *cert. denied sub nom. Guerrero v. Diocese of Lubbock*, 142 S. Ct. 434 (2021). A party may challenge jurisdiction on religious-liberty grounds. *Id.*

Ordinarily mandamus relief is available only if (1) a court clearly abused its discretion and (2) the relator has no adequate remedy at law. *See In re Sw. Bell Tel. Co.*, 35 S.W.3d 602, 605 (Tex. 2000) (orig. proceeding). But when a trial court signs an order in a case over which it has no jurisdiction, the order is void and constitutes an abuse of discretion. *Id.* When an order is void, a relator need not show an inadequate remedy at law. *Id.*

7

## IV. Subject-Matter Jurisdiction

Essential to a court's power to decide a case is subject-matter jurisdiction. *TitleMax of Tex., Inc. v. City of Austin*, 639 S.W.3d 240, 245 (Tex. App.—Houston [1st Dist.] 2021, no pet.). The plaintiff bears the initial burden of showing affirmatively that the court has subject-matter jurisdiction over the plaintiff's case. *Id.*

A defendant's plea to the jurisdiction seeks to dismiss the case for lack of subject-matter jurisdiction. *Diocese of Lubbock*, 624 S.W.3d at 512; *TitleMax of Tex., Inc.*, 639 S.W.3d at 245. When a plea to the jurisdiction challenges the pleadings, we determine whether the pleader has alleged facts showing the trial court's jurisdiction. *TitleMax of Tex., Inc.*, 639 S.W.3d at 246. We construe the pleadings liberally in the pleader's favor, accept all factual allegations as true, and look to the pleader's intent. *Id.* If the pleadings are insufficient but potentially curable, the court should afford the pleader an opportunity to replead, but if the pleadings affirmatively negate the existence of jurisdiction, the court shall dismiss. *Id.*

We review de novo a trial court's ruling on a plea to the jurisdiction. *Diocese of Lubbock*, 624 S.W.3d at 512; *TitleMax of Tex., Inc.*, 639 S.W.3d at 245.

## V. Ecclesiastical Abstention Doctrine

The ecclesiastical abstention doctrine prohibits civil courts from delving into matters of theological controversy, church discipline, ecclesiastical government, or members' conformity to the church's moral standards. *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713–14, 96 S. Ct. 2372, 2382 (1976) (quoting *Watson v. Jones*,

80 U.S. 679, 733 (1871)). The doctrine is grounded in the First Amendment, which protects the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. *Id.*; *Diocese of Lubbock*, 624 S.W.3d at 508–09.

A core tenet of the First Amendment is that courts must be careful not to intrude on the internal affairs of church governance and autonomy. *Westbrook v. Penley*, 231 S.W.3d 389, 397 (Tex. 2007). Autonomy extends to the rights of hierarchical religious bodies to establish their own internal rules and regulations and to create tribunals for resolving disputes over religious matters, and this autonomy extends to a church's conclusions regarding its own ecclesiastical rules, customs, and laws. *Diocese of Lubbock*, 624 S.W.3d at 513. Government action that interferes with this autonomy or that risks judicial entanglement with a church's conclusions regarding its own rules, customs, or laws is thus prohibited by the First Amendment. *Id.*

Not all claims against religious institutions, however, are barred by the First Amendment. *Id.* A court may exercise jurisdiction over a controversy if it can apply neutral principles of law that will not require inquiry into religious doctrine, interfere with believers' free-exercise rights, or meddle in church government. *Id.* Under the neutral-principles methodology, courts decide non-ecclesiastical issues such as property ownership based on the same neutral principles of law applicable to other entities but defer to a religious entity's decisions on ecclesiastical and church polity questions. *Id.*

9

While the Texas Supreme Court has not applied the neutral-principles methodology outside of church property disputes, it has recognized that lower Texas courts—in certain, narrow circumstances—have found them applicable. *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 596 (Tex. 2013). The supreme court has stressed that any exception to the ecclesiastical abstention doctrine must be narrowly drawn to avoid inhibiting the free exercise of religion or to avoid imposing secular interests on religious controversies. *Id.* Put differently, courts should consider not only whether a neutral principle exists without regard to religion but also whether applying neutral principles would impose civil liability on a church for either complying with its own internal rules and regulations or resolving a religious matter. *Id.* Further, even if neutral principles of law are applied, if a court's ruling may implicate free-exercise concerns, such as a church's standard of morals or church discipline, the ecclesiastical abstention doctrine deprives the court of jurisdiction over the dispute. *Westbrook*, 231 S.W.3d at 399.

When determining whether the ecclesiastical abstention doctrine applies, courts analyze whether a particular dispute is an ecclesiastical dispute or a civil-law controversy in which the church happens to be involved. *Diocese of Lubbock*, 624 S.W.3d at 514. When making this determination, courts look to the substance and nature of the plaintiff's claims, and if they are inextricably intertwined with matters of doctrine or church governance, then the case must be dismissed because courts are prohibited from risking judicial entanglement in ecclesiastical matters. *Id.*

10

The neutral principles approach is not without limitations. *Episcopal Diocese of Fort Worth v. Episcopal Church*, 602 S.W.3d 417, 428 (Tex. 2020), *certs. denied*, 141 S. Ct. 1373 (2021).[6] When ecclesiastical questions are at issue, deference is mandatory because courts lack jurisdiction to decide ecclesiastical questions. *Id.* Neutral principles of law are applied to issues such as land titles, trusts, corporate formation, corporate governance, and corporate dissolution, even when religious entities are involved, but if an instrument incorporates religious concepts so that interpretation of ownership instruments would require a civil court to resolve a religious controversy, the court must defer to the authoritative ecclesiastical body's resolution of that issue. *Id.* Consequently, in some instances, deferring to the ecclesiastical bodies' decisions in matters reserved to them by the First Amendment effectively determines the property rights in question. *Id.*

## VI.  Discussion

### A.  Significant Delay

As a preliminary matter, we address the over a year-and-a-half delay between the order denying the Conference's amended plea to the jurisdiction and its motion to reconsider. Delay is potentially a basis for denying mandamus relief. *See In re Moore*, 615 S.W.3d 162, 171–72 (Tex. App.—Austin 2019, orig. proceeding).

---

[6]Two writs of certiorari were filed, one by the Episcopal Church (supreme court cause number 20-536) and the other by All Saints' Episcopal Church (Fort Worth) (supreme court cause number 20-534). 141 S. Ct. 1373 (both).

In its motion to reconsider, the Conference relied on the issuance of several relevant opinions after the trial court signed the July 28, 2020 order to explain the delay. Within the Conference's motion to reconsider, it cites two opinions that issued while its amended plea to the jurisdiction was pending but before the trial court signed its July 28, 2020 order:

- *Episcopal Diocese of Fort Worth*, 602 S.W.3d at 417, decided May 22, 2020; and

- *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020), which was decided on July 8, 2020.

Although both opinions had issued before the initial ruling, both remained subject to change because post-judgment proceedings remained possible. *See* Sup. Ct. R. 44 ("Rehearing"). In the *Episcopal Diocese of Fort Worth*'s case, writs of certiorari were in fact later filed. The Conference cites two other opinions that issued after the July 28, 2020 order:

- *Diocese of Lubbock*, 624 S.W.3d at 506; and

- *In re Thomas*, No. 06-21-00106-CV, 2022 WL 126708, at *1 (Tex. App.— Texarkana Jan. 14, 2022, orig. proceeding [mand. pending]) (mem. op).

The *Thomas* opinion is not necessarily the final word on that matter because the party aggrieved by it filed a petition for writ of mandamus in the Texas Supreme Court that remains pending. *See In re Collier's Chapel Baptist Church*, No. 22-0263 (Tex. filed Apr. 4, 2022).

We also note that Judge David Evans signed the July 28, 2020 order and that he subsequently retired. Judge Chris Taylor, who was appointed in October 2021,

signed the April 29, 2022 order denying the Conference's motion to reconsider. Having Judge Taylor reconsider the matter was necessary. *See In re Bouajram*, No. 02-21-00072-CV, 2021 WL 3673856, at *1 n.1 (Tex. App.—Fort Worth Aug. 17, 2021, orig. proceeding [mand. pending]) (mem. op.); *In re Bunt*, No. 13-20-00263-CV, 2021 WL 2877934, at *1 (Tex. App.—Corpus Christi–Edinburg July 8, 2021, orig. proceeding) (mem. op.).

Ultimately though, subject-matter jurisdiction cannot be waived and can be raised at any time. *Alfonso v. Skadden*, 251 S.W.3d 52, 55 (Tex. 2008). The issue—whether delayed or not—cannot be avoided.

## B.  The *Church Manual*

In its first amended petition, the Northwest Church repeatedly relies on the *Church Manual* as the basis for its claims. For example,

> Pursuant to the [*Church Manual*], which governs policies and procedures at the local level of the [Seventh-Day Adventists], and describes the governance and function of local churches and the relationship between the local church and the Conference or other entities of the [Seventh-Day Adventists], when an offering is taken for any general or local purpose, like the Special Fund here, all money placed in the offering plate (unless otherwise indicated by the donor) is counted as part of that particular offering. "All offerings and gifts contributed by individuals for a specific fund or purpose must be used for that purpose. Neither the local church treasurer nor the board has the authority to divert any funds from the objective for which they were given."

Elsewhere, the Northwest Church asserts,

> The [*Church Manual*] clearly and explicitly instructs that "[l]ocal church funds . . . belong to the local church and are dispersed by the treasurer only by authorization of the board or business meeting." This

13

was not done, and was out of harmony with the [*Church Manual*] and church policy. Further, the [*Church Manual*] clearly and explicitly instructs that "All offerings and gifts contributed by individuals for a specific fund or purpose," like the fund specifically for Pastor [Gresham], "must be used for that purpose. Neither the treasurer nor the board has the authority to divert any funds from the objective for which they were given."

The Northwest Church's argument was that the provisions of the *Church Manual* on which it relied were nonsecular: "[The Northwest Church] will further show that the *nonsecular* provisions of the [*Church Manual*] are binding upon [the Northwest Church] and [the Conference], and provide that the right to ownership and use of the subject local church funds and personal property is vested in [the Northwest Church]." [Emphasis added.]

Within the Northwest Church's mandamus response, its reliance on the *Church Manual* continues extensively. Indeed, it maintains that resolving this matter depends on applying the *Church Manual*, but it argues that doing so can be done without transgressing the ecclesiastical abstention doctrine:

> [The Northwest Church's] suit to enforce the [*Church Manual*] requires no theological or ecclesiastical decision. [The Northwest Church] seeks only adjudication of whether [the Conference's] diversion of, and exercise of dominion and control over the Local Church Funds and the church building is authorized under the [*Church Manual*]. These issues do not implicate the ecclesiastical-abstention doctrine[.[7]]

---

[7]The Northwest Church argues elsewhere in its response that resolution of its dispute will implicate religious doctrine or practice:

> The pleading and jurisdictional evidence plainly show that this property dispute does involve resolution of religious doctrine or practice.

14

All the court must decide here is whether [The Conference] followed the[ *Church Manual*].

The Northwest Church contends that its dispute with the Conference can be resolved by utilizing neutral principles of law to construe the *Church Manual*: "[The Northwest Church's] claims requires no theological or ecclesiastical decision."

We agree with the Northwest Church that resolution of their dispute depends on the *Church Manual*. We disagree with the Northwest Church that we could do so without violating the ecclesiastical abstention doctrine.

## 1. Text: Secular or Ecclesiastical?

The *Church Manual* describes its authority and function:

> [The *Church Manual*] describes the operation and functions of local churches and their relationship to denominational structures in which they hold membership. The [*Church Manual*] also expresses the Church's understanding of Christian life and church governance and discipline based on biblical principles and the authority of duly assembled General Conference Sessions. . . .
>
> . . . .
>
> *The standards and practices of the Church are based upon the principles of the Holy Scriptures. These principles, underscored by the Spirit of Prophecy, are set forth in this* Church Manual. *They are to be followed in all matters pertaining to the administration and operation of local churches. The* Church Manual *also defines the relationship that exists between the local congregation and the conference or other entities of Seventh-[D]ay Adventist denominational organization.* No attempt should be made to set up standards of membership or to make, or

---

Instead, [the Northwest Church] merely seeks money damages for theft of property, conversion, and money had and received, claims over which the trial court has subject matter jurisdiction as a matter of law, and which can be determined by application of neutral principles of law.

15

attempt to enforce, rules or regulations for local church operations that are contrary to these decisions adopted by the General Conference in Session and that are set forth in this [*Church Manual*]. [Emphasis added.]

The *Church Manual* strongly discourages civil litigation: "Christian unselfishness will lead followers of Christ to suffer themselves to be defrauded (1 Cor. 6:7) rather than to 'go to law before the unrighteous, and not before the saints' (1 Cor. 6:1)." Exceptions are acknowledged:

> While there are, in the modern world, occasions for seeking decrees of civil courts, Christians should prefer settlement within the authority of the Church and should limit the seeking of such decrees to cases that are clearly within the jurisdiction of the civil courts and not within the authority of the Church or for which the Church agrees it has no adequate process for orderly settlement.

The *Church Manual* even provides examples of when going to civil courts is proper: "Examples of such civil cases may include, but are not limited to, the settlement of insurance claims, the issuance of decrees affecting the boundaries and ownership of real property, the deciding of some matters involving the administration of estates, and the awarding of custody of minor children."

Consistent with the above precepts, the *Church Manual* specifically warns against members bringing civil litigation against church entities: "Members should not instigate litigation against any Church entity except under circumstances where the Church has not provided adequate process for orderly settlement of the grievance or where the nature of the case is such that it is clearly not within the authority of the Church to settle."

For internal disputes, the *Church Manual* provides for an appellate process:

> When differences arise in or between churches and conferences or institutions, matters that are not mutually resolved may be appealed to the next higher organization. If the matter does not get resolved at this level, the aggrieved entity may appeal to successively higher levels of organization. An organization to which an appeal is forwarded may choose not to hear the matter, in which case the decision of the highest organization involved in the dispute shall be final. When organizations review decisions of other organizations, they do not assume responsibility for the liabilities of any other organization.

We note that the *Church Manual* potentially provides for two more hierarchical appellate levels—the regional division and the General Conference—that the Northwest Church has not joined as parties. Regardless, for our purposes, it suffices to note that the *Church Manual* provides for a stairstep appellate review of internal disputes.

## 2. Application[8]

The Northwest Church's suit asks civil courts to resolve its dispute with the Conference based on its rights under the *Church Manual.* This is precisely the type of civil court inquiry that the First Amendment prohibits:

> We have concluded that whether or not there is room for "marginal civil court review" under the narrow rubrics of "fraud" or "collusion" when church tribunals act in bad faith for secular purposes, no "arbitrariness" exception in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law. For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else [into] the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a

---

[8]Regarding access to the place of worship, in the Northwest Church's response, it asserts that in the suit below, it seeks title to the property. Our review of the Northwest Church's first amended petition shows that it sought access to and possession of the church building, not title to the church building. In any event, from this assertion in the Northwest Church's response, we can safely assume that the Northwest Church currently does not hold title to the property. And because the Northwest Church allegedly seeks this relief from the Conference (or perhaps one of the other Relators), we can also safely assume that the Conference (or one of the other Relators) currently does. Assuming that the Conference (or one of the other Relators) currently holds the title to the place of worship, a church has authority to determine who may enter its premises and who will be excluded without government interference. *See Retta v. Mekonen*, 338 S.W.3d 72, 76 (Tex. App.—Dallas 2011, no pet.). Ultimately though, we resolve all jurisdictional aspects of this suit based on the ecclesiastical abstention doctrine.

18

civil court must accept the ecclesiastical decisions of church tribunals as it finds them.

*Milivojevich*, 426 U.S. at 713, 96 S. Ct. at 2382 (footnote omitted); *see Westbrook*, 231 S.W.3d at 405; *see also United Methodist Church, Baltimore Ann. Conf. v. White*, 571 A.2d 790, 794 (D.C. 1990).

The Northwest Church's case is not one in which it has separated from its hierarchical organization and in which it and the hierarchical organization dispute who owns what. *See, e.g.*, *Episcopal Diocese of Fort Worth*, 602 S.W.3d at 420. Rather, this is a dispute over who has the authority to make decisions on behalf of the Northwest Church now that Pastor Gresham has been terminated and the prior governing board has been dissolved.

In the Northwest Church's response, it acknowledges that it remains a Seventh-Day Adventist Church:

> While [the Conference] purport[s] to contend that [the Northwest Church] is "not a recognized Seventh-[D]ay Adventist Church, [the Conference] previously admitted that decisions about the local church's future are "pending," . . . , and ha[s] come forth with no evidence to support any further action has been taken in this regard. . . . Rather, [the Northwest Church] continues to receive mail from [the Conference]—none of which has informed [the Northwest Church] that it is no longer recognized as a Seventh-[D]ay Adventist Church, and [the Conference] continue[s] to recognize [the Northwest Church] as a local church on its website.

Consistent with the Northwest Church's understanding, the Conference does not dispute that a "local church" exists but focuses, instead, on whether the newly elected governing board represents that church:

19

> [The Northwest Church] purports to be a local congregation within the Seventh-[D]ay Adventist Church. . . . The higher level within the hierarchical church structure, however, has not recognized this congregation as acting on behalf of the properly constituted local church. . . . To the contrary, the higher level within the hierarchical church structure terminated the local church pastor for failure to comply with Church policy, and took action to safeguard the local church's funds and the church building. . . . The local congregation, claiming to act on behalf of the local church . . . , contends that these actions were taken in contravention of the Seventh-[D]ay Adventist *Church Manual*, and brought suit seeking injunctive and declaratory relief.

Put another way, from the Conference's perspective, someone other than a duly recognized authority within the local church is attempting to spend the local church's money and use the local church's place of worship, so the Conference has intervened to safeguard both.

Admittedly, under the *Church Manual*, the local church funds appear to belong to the "local church":

> Local church funds include church expense, building and repair funds, and the fund for the poor and needy. These funds belong to the local church and are disbursed by the treasurer only by authorization of the board or business meeting. However, the treasurer shall pay from the expense funds all bills for local expense that have been authorized by the board.

Nevertheless, the dispute is over whether the Northwest Church is the "local church," as contemplated by the *Church Manual*, when the Conference has not recognized the newly elected governing board.

Whether the Conference acted in a manner consistent with the *Church Manual* is an internal matter for the Northwest Church and the Seventh-Day Adventist

20

hierarchy to resolve. *See Diocese of Lubbock*, 624 S.W.3d at 513; *Retta*, 338 S.W.3d at 77. The Northwest Church's claims are inextricably intertwined with matters of doctrine or church governance; because courts are prohibited from risking judicial entanglement in ecclesiastical matters, the case must be dismissed. *See Diocese of Lubbock*, 624 S.W.3d at 513.

The Constitution broadly protects a church's autonomy in managing its affairs and deciding matters of church discipline. *See Westbrook*, 231 S.W.3d at 397. The Northwest Church has united itself to the Conference and has impliedly consented to its government; the Northwest Church is bound to submit to its hierarchy. *Id.*

## VII. Conclusion

The ecclesiastical abstention doctrine deprives the trial court of jurisdiction to resolve this internal dispute between the Northwest Church and the Conference. *See Diocese of Lubbock*, 624 S.W.3d at 508–09, 513. We conditionally grant Relators' petition for writ of mandamus. We direct the trial court to vacate its April 19, 2022 order denying "Defendants' Motion to Reconsider Order Denying Amended Plea to the Jurisdiction" and to render an order granting that motion and dismissing the Northwest Church's case for want of jurisdiction. We are confident that the trial court will comply with these directives; the writ will issue only if the trial court fails to do so.

21

/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  July 21, 2022